[Crim. No. 5029.   Second Dist., Div. Three.   Dec. 28, 1953.]

THE PEOPLE, Respondent, v. FRANCIS RAVEL, Appellant.

Bernard B. Cohen for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

SHINN, P. J.—Francis Ravel appeals from a judgment convicting him of two offenses of grant theft, and from an order denying motion for new trial. He was denied probation and sentenced to state prison.

The case was tried without a jury on the testimony received at the preliminary examination and additional testimony given by defendant and his witnesses upon the trial. Included also were exhibits consisting of books of purchase orders, a packing slip, receipt books, a note book, shipping bills, purchase receipts, a number of control sheets, as well as invoices, purchase orders and sales orders.

We should say at the outset that the record on appeal is confusing to a degree that we have seldom, if ever, encountered in a simple case. We have studied it with care and have come to the conclusion that the prosecution was the outgrowth of what was at most a dispute between an employer and an employee over financial matters which the former took to the criminal courts, although the very matters in dispute were the subject of a pending civil action brought by the employee. We are of the opinion that had the facts been truly stated to the authorities, criminal proceedings would not have been instituted prior to the determination of the civil litigation, if at all.

Ravel was employed by a man named Constantine, who was in the business of selling television sets under the business name of Conlan Bros. He was in Constantine's employ for some four months immediately preceding the latter part of February, 1952. He was a salesman of television sets, and he worked strictly on a commission basis, the profits of his sales being divided between himself and Constantine. There appears to have been no regularity in the matter of computation and settlement of Ravel's earnings. It had been the practice, agreed to by Constantine and Ravel, for the latter to purchase for himself articles on Constantine's credit, the amounts of which were deducted from Ravel's earnings from time to time. Upon one occasion Constantine paid out

in cash $100 on a purchase made by Ravel when there were no unpaid commissions due the latter. In the latter part of February Ravel was insisting upon an accounting. The records of the business were in such shape that it was apparently difficult, if not impossible, to determine how much was due him. In the course of a discussion between Ravel and Constantine as to the amount due the former, Constantine gave Ravel a blank check, told him that the joint signatures of Jean Grike, the bookkeeper, and himself were required, instructed him to take the check to Jean Grike at her home, have it filled out and return it, when he, Constantine, would sign it. Ravel took the check and went to the home of Jean Grike, but was unable to find her because Constantine in the meantime had telephoned and instructed her to conceal herself. Constantine testified that shortly thereafter he discharged Ravel, and Ravel testified that he quit. Ravel then had in his possession eight or nine purchase contracts approved by the bank which was discounting contracts; he offered to give these to Constantine but requested that he be given a receipt for them. Constantine refused to give a receipt and called the police. His purpose was to force Ravel to surrender the contracts without a receipt. Ravel waited for a considerable time, but when the police had not arrived, he left the contracts with Constantine without getting a receipt.

Following the termination of his employment Ravel brought an action for money due from Constantine, and he caused an attachment to be issued. Constantine immediately went to the authorities and swore to a criminal complaint accusing Ravel of four offenses of felony. A complaint was issued charging: (1) Theft of a television set valued at $559.95; (2) theft of a television set of the value of $380; (3) theft of $245 in money from Ira Lloyd Peers; and (4) forgery of a receipt in writing for $245, with intent to defraud Constantine, Conlan Bros. and Jean Grike.

The complaint did not describe the television sets alleged to have been stolen otherwise than by stating their value. The evidence at the preliminary disclosed that the set referred to in count I was an Admiral set acquired by defendant on the credit of Constantine, and upon which Ravel turned in to Constantine as part payment a Hoffman set which he owned. The set referred to in count II was an RCA set purchased by one Peers for $245, for which Peers gave Ravel his check in that amount. The sum involved in this transaction was the identical amount that Ravel was accused of

having stolen from Peers in count III of the complaint. The forgery alleged in count IV was the claimed alteration of a receipt for $245 in favor of defendant, signed by Jean Grike on behalf of her employer. This related to the Peers check in that amount.

Eight witnesses testified for the People at the preliminary; defendant did not testify. The evidence related to all four of the transactions which were the subject of the complaint. At the conclusion of the evidence defendant was bound over on counts II and III, namely, theft of the RCA set that was sold to Peers, and theft of the $245 in money, represented by Peers' check to defendant. This check was never cashed. Defendant was not bound over on count I, which charged theft of the Admiral set, nor upon the charge of forgery as alleged in count IV.

In due time an information was filed charging in separate counts: I. Theft of the Admiral set, as to which the charge had been dismissed by the magistrate; II. Theft of the RCA set that was sold to Peers; and III. Theft of $245 from Peers. Defendant was convicted of theft of the Admiral set (count I) and theft of the RCA set (count II) and was acquitted on count III.

The grounds for reversal are: (1) That defendant was improperly tried on count I for the reason that the offense charged in that count of the information was the same as that charged in count I of the complaint, for which defendant had not been held to answer (see *Parks* v. *Superior Court*, 38 Cal.2d 609 [241 P.2d 521]), and (2) there was insufficient evidence to justify a finding of guilt of the theft of the Admiral set, as charged in count I of the information, or of the RCA set as charged in count II. We have concluded that the second ground of appeal is valid as to both counts, and that it is not necessary to consider the first ground. The principal, if not the only, question as to the first ground is whether the objection on the ground that count I related to a transaction as to which the magistrate had entered a dismissal was timely made.

With respect to our discussion of the sufficiency of the evidence we may say that our recital of the evidence is but a summary of the pertinent facts which were established without dispute. A more detailed statement of the evidence, as it was given, would tend to obscure rather than illuminate the case in true perspective. The testimony at the preliminary comprises 188 pages. It related to all of the charged offenses

indiscriminately. It covers such matters as Constantine's methods of doing business, the practices of his employees and the business practices of the houses from which he purchased the products which he handled; it developed that Ravel had been constantly ordering television sets for Conlan Bros. with Constantine's approval and as his "purchasing agent"; that it had been a common practice for Ravel to purchase articles for himself and charge them to Constantine with the latter's approval, and to pay for them out of his earnings (a Hoffman TV at a cost of $286, an O'Keefe & Merritt stove, a Sunbeam toaster, tires for Ravel's automobile, a Reliable water heater and a Motorola car radio). Constantine admitted the existence of the arrangement but did not testify that any limitation had been placed upon defendant's purchases on Constantine's credit, either as to time or amount.

After the preliminary, Constantine was adjudged a bankrupt and Ravel filed a claim for commissions due him. Constantine testified that at the time Ravel was discharged, or resigned, there was no money due him. At the trial it was established that Constantine owed Ravel $1,000, and a certified copy of the order of the referee approving his claim was in evidence.

There were two vital questions in the case: (1) Whether Ravel had authority from Constantine to purchase a television set and charge it to Constantine; and (2) whether Ravel had money due him, or agreed credit, sufficient to cover the amount of his purchases. Both facts were conclusively established in Ravel's favor.

As to the Admiral set (count I), Constantine himself testified that he had agreed with Ravel that the latter might purchase a television set for himself, charge it to Constantine and turn in as part payment his Hoffman set above mentioned. It was established that the Hoffman set was delivered to an Admiral dealer for credit to Constantine's account, that Constantine knew it came from Ravel, received it, that it went into the hands of his trustee in bankruptcy and was liquidated as an asset of the estate in bankruptcy. It was proved beyond question that when Ravel made a purchase on the credit of Constantine, either for himself or a customer, the seller promptly notified Constantine in writing, by invoice, and that such notification would go into Constantine's records. There was, in our opinion, no evidence to justify a conviction under count I. When Constantine

was informed of Ravel's purchase, instead of charging any balance of the price of the set to Ravel's account he accused Ravel of theft. We do not see how he could have acted in good faith in stating the case to the authorities.

As to count II, it was established by the testimony of Constantine and Peers that Peers examined an RCA set, made an arrangement with Constantine to buy it at a wholesale price, that Constantine was advised by Peers that he had bought the set under an arrangement with Ravel, that it had been delivered to him, and that Peers told Constantine that he had given Ravel a check for the purchase price of $245. There was no evidence that Constantine objected to the transaction, either to Peers or to Ravel, or that he ever demanded from Ravel payment for the set. Although Constantine testified that Ravel had no authority to make purchases for him in the ordinary course of business, it was proved beyond question that it had been the general practice of Ravel to make such purchases and that in the case of one of the largest distributors Ravel was the only one in the Constantine organization who issued such orders. It was not denied that Constantine was well aware of this practice. When Ravel purchased the Admiral set for himself Constantine was promptly given written information of the sale and also of the delivery of the set to defendant. When Peers bought his set the seller likewise forwarded to Constantine a record of this sale and of the delivery of the set. There was nothing whatever in evidence to show that Ravel was guilty of any act which could have been successfully concealed from Constantine. This for the reason we have pointed out, that each purchase was charged to Constantine by the sellers, openly and in a manner that had been customary.

There was uncontradicted testimony by Peers that he gave defendant a check for $245 in payment for the RCA set. For some undisclosed reason Peers stopped payment on the check and it was never presented for payment. Later Peers gave a check for $245 to the trustee in bankruptcy in payment for the set, but this check bore the unaccountable notation that it was not to be presented for payment until disposition had been made of the criminal charges pending against Ravel. Apparently some undisclosed person thought it would be better that the court should not know that Peers had paid for the set.

Defendant testified that he gave the first $245 check to the bookkeeper, Mrs. Grike. He produced a carbon copy of

a receipt by Mrs. Grike for $245 on which was noted the word "cash." Mrs. Grike testified at the preliminary that she did not receive this check. She testified that she had given Ravel a receipt for $20 in a cash transaction about the time of the $245 check transaction. It was claimed by the People that if the $245 receipt had been genuine defendant would have had the original instead of a copy. However, it was developed in the evidence, and commented upon by the court at the trial, that there was no uniformity in this practice; sometimes the original would be given out and at other times it would be kept in the book, and a copy would be given out. The trial court was satisfied that Peers issued the first $245 check and gave it to defendant, and the court so stated. In discussing the evidence the court found that Ravel did not steal $245 from Peers, an obviously correct conclusion. It also found that defendant had stolen the RCA set from Constantine (the one that went to Peers), notwithstanding Constantine's knowledge and approval of the sale. If defendant had cashed the check it could have been inferred either that he intended that the amount would be charged against his commissions or that he had some dishonest motive. In summary, this transaction was one in which Peers got the set through defendant with Constantine's knowledge and approval, paid for it in full, and defendant got nothing.

With respect to the receipt for $245 and the evidence respecting the receipt for $20 there was much confusion in the evidence. Apparently there were several receipts for $20. The court stated that four of them had appeared. The testimony of Mrs. Grike at the preliminary left much to be explained. Her records were confused and inadequate. She was not called as a witness at the trial. Many times the court referred to the confusing state of the records and to Constantine's business methods as "slipshod" and "a mess."

If, as the People contended, Ravel took a blank copy of a receipt bearing Jean Grike's carbon signature and altered the same by inserting the amount of $245 with the intention of using it as he later used it to prove that he had delivered the check or the money to Jean Grike he would have been guilty of forgery as charged in the fourth count of the complaint. Yet the magistrate dismissed the charge of forgery. In view of this fact it would serve no purpose to discuss the probabilities with respect to the genuineness of the receipt or to endeavor to account for the disappearance of the check.

Moreover, with relation to the charge of theft it would seem to be immaterial whether Ravel turned over the check to Mrs. Grike or carried it around in his pocket without cashing it. Defendant did not get the set; Peers got it. If defendant had had any criminal intent to benefit from the transaction he would have cashed the check. If he had none there was no reason whatever for withholding it from Constantine.

We think we have made it sufficiently clear that this controversy belonged exclusively in the civil courts. When it was determined that Constantine owed Ravel $1,000 that should have ended the matter. We could well understand that when Constantine went to the authorities representing that Ravel had given purchase orders for television sets which he was not authorized to do, had charged them to Constantine without authority, no doubt concealing from the authorities the fact that it had been a practice for Ravel to make purchases to be paid for out of his commissions, and when the further claim was made by Constantine that he owed nothing to Ravel, perhaps concealing the pendency of the civil suit, there might have been reasonable cause to believe that some crime had been committed and that criminal proceedings should be instituted. We can understand, also, the magistrate's action in holding Ravel for trial upon Constantine's undisputed testimony that Ravel had no authority to purchase on Constantine's credit and that no money was due him. Nevertheless, at the time of trial it was established that the controversy arose out of what was essentially a debtor and creditor relationship, the merits of which had been determined in Ravel's favor.

We appreciate the difficulty the trial court had in discovering the facts from the record which we have found so confusing. Unquestionably, it is a case in which the use of the preliminary transcript made it more difficult for the court to decide the factual questions. The court said: ''I don't think any of us have any difficulty in concluding that the office arrangements, bookkeeping and other matters pertaining to this rather pretentious business, I would say, were far from being anything sy[s]tematic. I think we have to find our way out of this morass largely by a consideration of the documentary evidence which has been introduced and by gaps where there is no documentary evidence. The only witnesses in this whole transaction which I personally observed were Mr. Ravel and his wife and the character witnesses, of course,

so I have had no opportunity to size them up as we direct the jury to do as to their appearance and other characteristics, so *I imagine that it may be possible in some respects they stretched the truth somewhat and perhaps lied deliverately, or perhaps are telling the truth in some respects and not in others,* but we have certain documents which were made during these transactions which have been given considerable consideration.'' If the court had reference to the records kept by Constantine we must say that they do not go to the merits of the case nor enlighten us thereon. It is true that when Ravel ordered the Admiral set he instructed the seller to add it to another order for an Admiral sold to one Ross, and that he neglected to enter it upon the copy which was retained in Constantine's office files. But the information would necessarily have come to Constantine from the seller in the regular course of business. Moreover, we repeat that Ravel admittedly had express authority from Constantine to buy a set for himself. Under these circumstances defendant's neglect to promptly add his own set to the office copy of the order for the Ross set does not suggest any element of criminal intent, or even of deceit. The court commented upon the ''hit and miss fashion of doing things'' when speaking of Constantine's methods, and again stated to counsel: ''Didn't I tell you that I thought that whole system was a mess.'' In the argument on the motion for new trial the court inadvertently confused defendant's purchase of the Admiral set for himself and his delivery of the $245 check in connection with Peers' purchase of the RCA set, stating that his testimony was ''entirely inconsistent with his claim that he kept it for himself, in fact, he claims here that he paid for it.'' As we have seen, the set which defendant kept was the one upon which he had traded in his Hoffman set to Constantine, which was the subject of the accusation in count I of the complaint, which had been dismissed.

The critical question in both transactions was whether defendant acted with an intent to deprive Constantine of his property. It appears to us that the learned trial judge overlooked the established fact that there was due to defendant $1,000. In summing up the evidence, the court said of the defendant: ''He is claiming that Conlan Brothers are very much indebted to him for the services rendered and commissions earned'' etc. However, as we have stated, Constantine's testimony that he owed Ravel nothing was proven to be utterly false, and this fact established beyond question that

Constantine was fully protected against any possible loss in either transaction. Since Ravel could not have avoided paying for the sets, where can be found a criminal intent?

We cannot disassociate defendant's conviction under count II with his conviction under count I. The court found defendant guilty of theft of the Admiral set which implies, of course, that he had a felonious intent in that transaction. Whether because of the confusing state of the evidence, or for some reason that is not clear to us, the trial court must have overlooked the evidence of Constantine with respect to count I, which established beyond question that Ravel had authority to do exactly what he did. The court came to the erroneous conclusion that Ravel had stolen the Admiral set and, so far as concerns the defendant's intent, if that were true it would have aroused suspicion that he also intended to steal the set which went to Peers, or the money. And yet it would have been an unfounded suspicion since it appeared without dispute that Constantine lost nothing and defendant gained nothing in the Peers transaction.

There is but one other matter to which we will refer. In the probation hearing it appeared that defendant had insisted he was innocent and that an appeal would be taken. Defendant's attorney made the statement in court that the probation officer, a deputy no doubt, had advised him that where an appeal is to be taken probation is not recommended. The court stated that it did not know of that policy, and then made the following statement which, we confess, we do not understand: "Of course, there is this basic thought in connection with probation, probation is a rehabilitation measure. When a defendant denies his guilt which he has certainly a right to do and which he should do if he is conscientious in the matter, there is no element of rehabilitation involved, nothing to rehabilitate him from. Of course, with a lot of these wishy-washy fellows around here, we do not draw the line too finely in that regard, but Mr. Ravel is not an unintelligent man." It is true that the court proceeded to state that a persistent denial of guilt should not militate against the convicted accused, yet probation was nevertheless denied and defendant, of good repute and, so far as shown, with a clean record, was sentenced to state prison. Having in mind that in order to establish guilt it was necessary to prove that defendant did "felonious steal and take" the television sets

(Pen. Code, § 484), we find that he was convicted of crimes he did not commit.

The purported appeal from the order denying probation is dismissed. The judgment and order denying motion for new trial are reversed with instructions to dismiss the cause.

Wood (Parker), J., and Vallée, J., concurred.