[Crim. No. 11130. In Bank. Aug. 8, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. FRED KIPP
BASSETT, Defendant and Appellant.

Fred Kipp Bassett, in pro. per., and Richard A. Ibanez, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Richard D. Huffman, and James H. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

MOSK, J.—Defendant was charged by information with two counts of murder, and pleaded not guilty and not guilty by reason of insanity to both. The jury returned verdicts of first degree murder on each count, found defendant sane at the time of the commission of the crimes, and fixed the penalty at death. The court denied motions for new trial and for reduction of the penalty. The appeal is automatic. (Pen. Code, § 1239, subd. (b).)

We have before us the tragedy of a youth suffering since childhood from deep-seated paranoid schizophrenia, who at the age of 18 methodically executed his mother and father. The evidence is overwhelming that while he planned the parricide with precision and knew that it was wrong, his diminished mental capacity was such that he could not maturely

and meaningfully reflect upon the gravity of his contemplated acts. The deputy district attorney acknowledged in argument to the jury that "everyone, including myself, everyone agrees that this boy was and had been a paranoid type of schizophrenic"; indeed, defendant's abnormal mental condition was well known long in advance of trial.[1]

In these circumstances we must once again shoulder the burden of dissecting a lengthy record and weighing the "substantiality" of the prosecution's evidence of mental capacity. (See, e.g., *People* v. *Goedecke* (1967) 65 Cal.2d 850 [56 Cal Rptr. 625, 423 P.2d 777]; *People* v. *Nicolaus* (1967) 65 Cal.2d 866 [56 Cal.Rptr. 635, 423 P.2d 787].) This is a responsibility we are empowered by statute to perform (Pen. Code, §§ 1181, subd. 6, and 1260), and we will not hesitate to act, as here, to prevent a grave miscarriage of justice.

---

[1]Defendant was arrigned on the information on January 16, 1964, and Drs. Marcus Crahan and Dayrel D. Smith were appointed to examine him upon his plea of not guilty by reason of insanity. (Pen. Code, § 1027.) On January 24 Dr. Crahan filed his report, in which he stated that defendant "has been in the County jail since December 19, 1963. On the 21st of December, he was found banging his head against the wall. Inspection revealed a red raised area in the middle of his forehead. He stated he banged his head because, 'I should feel guilty but I don't.' On December 22, he appeared highly nervous, agitated, trembling, stuttering; states he has an urge to kill himself. He also expresses concern that the other inmates want to kill him, but he admitted that no one had made threats to him. On the 23rd of December, he was again agitated, trembling, says everyone wants to kill him. On December 24th, he inflicted a few light lacerations on each wrist. He has been placed on librium four times daily and appears somewhat more calm.

"This defendant is totally without moral insight into the nature of his alleged act. He even states he is happy for having committed it but can't see why he should be punished. He admits to planning the act carefully because his parents were hypocrites in not following the tenets of their religion. He is suffering from paranoid schizophrenia and was suffering from that disease at the time of his alleged acts, alleged commission; his act being triggered by a delusion, makes him legally insane relative to the alleged acts and continuing legally insane at the time of present examination."

On February 4, 1964, Dr. Smith filed his report, stating that "It is my opinion that this defendant is legally insane at the present time, and was legally insane at the time of commission of this offense. This defendant does not know the difference between right and wrong, is not aware of the nature and consequences of his acts, is as cooperative as possible, but entirely unable to cooperate with counsel to aid in making a plan in his own defense." The doctor reported that defendant suffered from paranoid schizophrenia, manifesting itself in delusions of grandeur and persecution, in recurring auditory hallucinations, and in inappropriate emotional responses. The doctor concluded that "The persistence of his hallucinations and his preference for his unreal world seriously impair the defendant's memory and comprehension, and together with his. delusions deprive the defendant of his judgment. . . . This defendant has been mentally ill for many years, and the offense is an outgrowth of the

*The prosecution's case in chief.* To an accusation charging a defendant with the crime of murder (Pen. Code, § 187), there is as yet no statutory plea of "not guilty of first degree murder by reason of diminished mental capacity." Accordingly, the prosecution here was compelled to go through the ritual of establishing a prima facie case of murder that no one in fact disputed.[2] By means of the customary parade of witnesses—not one of whom did defendant challenge on cross-examination—and introduction of exhibits—to none of which did defendant object—the following events were shown to have taken place:

Officer Meyer arrived at defendant's house at 4:30 p.m. on December 19, 1963, in response to a call for assistance. Defendant told him that his mother and father had been arguing and had gone into their bedroom and bolted the door; that he thereafter heard two shots in succession, but was unable to enter the bedroom to see what had happened; and that he summoned the neighbors, Mr. and Mrs. Glass, who in turn called the police. The officer forced the bedroom door and found two bodies on the floor. Defendant's mother was lying on her back with a .22-calibre single-shot Derringer pistol in her right hand. She had been shot in the head at close range; although still alive, she died without regaining consciousness. Defendant's father was lying nearby, dead from a gunshot wound of the chest that had also been fired at close range. A lamp in the parents' room had been turned on its side.

Homicide detectives thereafter found in defendant's bedroom a matchbox containing a small piece of paper with a note on it in defendant's handwriting. At the top was written "12, 1963"; below, the following appeared:

profound thinking disturbance which is present. It appears that this offense occurred as a response to delusions and hallucinations and that defendant's thinking and acting have been unreasonable and illogical throughout."

On February 28, 1964, the court considered these reports, found defendant to be "presently insane," and committed him to Atascadero State Hospital. (Pen. Code, § 1370.)

Some two years and two months later, on May 4, 1966, defendant was certified to have recovered sufficiently to enable him to stand trial. (Pen. Code, § 1372.) The Atascadero staff findings recited that as of that date defendant was "mentally ill, but not to the extent that he doesn't know the nature of the charges against him. He will be able to cooperate with his attorney." He was diagnosed as a chronic schizophrenic.

Defendant was finally brought to trial on December 5, 1966, almost three years after he killed his parents.

[2] Thus in his opening statement to the jury defense counsel said, "Ladies and gentlemen, it is not denied that the parents of that boy died at his hands."

"1. As planned S-2.

"2. Then remove shell and put F/prints on.

"3. Then put G in M's hand.

"4. Muss room, lamps."

On the reverse side was written "Et cetera," then the following:

"5. Put F nearby.

"6. Lock door.

"7. Get Glasses."

In a corner of the paper was the word "Plans"; and on one side, the word "Remember," below which was written, "Wear plastic hood, leather gloves for shot, whites for prints."

Also found in defendant's bedroom were a pair of black leather gloves and a pair of white cotton gloves, both lying in open view; the latter were damp, and crumpled within them was a piece of string several feet long. There was a box containing 47 live .22-calibre shells in defendant's dresser drawer, and a plastic bag with blood on it in a wastebasket in the adjacent hallway. Sales slips found in defendant's wallet showed that he had purchased the Derringer on December 12, 1963, from a local sporting goods store.

Defendant's former brother-in-law testified that several years earlier he and defendant had learned from watching television how to bolt the bedroom door from the outside by means of a piece of string passed around the edge of the door and then withdrawn.

Harold Glass, defendant's neighbor, testified that in a conversation at the jail shortly after the shootings defendant told him that he had murdered his mother and father but did not regret it, and that he planned to kill his sister some day too.

George Dutra, a psychiatric technician at Atascadero, testified that defendant was assigned to his ward for one year beginning in April 1964, and often discussed the case with him. Defendant told Dutra he had been planning to kill his parents since he was about eight years old. On the day of the shootings he took his gun, went to his mother's bedroom, and asked her to turn around and close her eyes because he had a surprise for her. He then put the gun to her temple and pulled the trigger. Upon hearing the shot his father came in and told him to get a wet towel. Defendant went to his own room, reloaded the gun, and returned to his parents' room.

His father was bending over his mother's body, and defendant placed the gun against his father's chest and fired the second shot.

Referring to his mother, defendant told Dutra that "the old biddy took quote a while to die," and he tried to suffocate her with a plastic bag. He said he intended to make it look like a murder-suicide, had devised a way to bolt the door from the outside with a piece of string, and had written out a set of plans to this effect. When asked how he felt about killing his parents, defendant said that he "enjoyed" doing so; that they "deserved" to die because "All crumbs deserve to die"; and that they drank a lot and argued a lot and were cold towards him. Showed him "very little love and affection." Defendant stated that killing them was one of the most "glorious" or "heightened" or "wonderful" experiences of his life. He said he was "quite amused" by their struggle to live, and made no offer to help them as they lay dying on the floor. Finally, he told Dutra he would also like to kill two other psychiatric technicians on his ward.

With cross-examination of this witness, however, the other side of the case began to emerge. Dutra acknowledged that defendant was admitted to Atascadero with the diagnosis of schizophrenic; he was considered a very dangerous patient, and was kept under sedation by use of ataraxic drugs "almost the entire time he was there" because of his "suicidal tendencies, homicidal tendencies, anxiety, hallucinations." Explaining the latter phenomenon, Dutra testified that defendant told him he heard the voice of "Christopher Chamberlain," who told him to do "bad things," including kill his parents. Another voice he heard was that of "Juanita Gomez," assertedly a prostitute. Dutra observed defendant pacing the floor and moving his lips as though talking to someone, and at other times saw him mumbling alone in his room.

*The defense.* When the prosecution rested its case in chief, the defense came forward with a mass of evidence to establish that by reason of his illness defendant lacked the mental capacity to entertain the state of mind necessary to be found guilty of murder in the first degree.

Dr. Dayrel D. Smith, one of the court-appointed psychiatrists in this case, examined defendant for several hours approximately one month after the killings. He determined that defendant "was seriously and severely mentally ill and that the major portion of the difficulty consisted in disorder

of "thought," manifesting itself in "fluctuating reality contact." Defendant, who was experiencing auditory hallucinations at the very time of the interview, informed the doctor that "I was interrupting his existence and destroying the train of thought of the voices that he was hearing. . . ." Dr. Smith subsequently stated that "He couldn't refuse to listen to his hallucinated voices, but he could refuse to listen to me, you know. He couldn't deny the imperative nature of what was going on in his own head, but I was an outsider."

From other observations the doctor determined that defendant was also in the grip of a delusional system. The delusions centered around his belief that he was "superior" and "psychic," and "was capable of receiving the thoughts of other people." Defendant further believed, however, that "everybody has the potential to harm him," and that he had "received" a thought from his parents to the effect that "he was nuts, and this troubled him."[3]

Dr. Smith further testified that defendant's flattened "affect," i.e., his lack of remorse or any other appropriate emotion, was typical of the schizophrenic personality, as was his "break with reality" in the form of hallucinations and delusions. Such phenomena, on the other hand, are very real to the patient.[4]

In Dr. Smith's opinion, defendant had been mentally ill for years. As evidence of this, he explained that hallucinations and delusions such as defendant exhibited "only arise in an illness out of an earlier maladaptation. They are compensa-

---

[3]This thought, stated Dr. Smith, "struck at the content of his delusions, which were that he was a superior being with an absolute right to do what he wanted. If you want an explanation for the acting out of all of this psychotic material, it was probably that the offense occurred because [the facts of] the delusions being hit at and downgrading him weren't tolerable for him. He had to maintain his own falsified world where he was the superior being, and he couldn't tolerate the thoughts which came to him which he believed came from his parents and which downgraded him and set his feelings of superiority apart."

[4]The doctor explained that "the purpose that his delusions serve is to compensate him for what he lacks, for his inability to compete with more masculine people. It makes his world a place where he is more comfortable to live and where he gets satisfaction.

"The same thing is true of the nature of hallucinations. These things appear to come from outside, but they are products of the mind. They are inside. The very fact that they are products of the mind and not something out yonder makes them of . . . significance to the person who is mentally ill, and these hallucinations were significant to this defendant. The internal world was a warmer, friendlier place to be. If you need to have hallucinations about a warmer friendlier place, the only thing that there is about it is that the real world isn't a warm and friendly place.

tory things. They are things which falsify reality in a way that makes more satisfactory and meets the patient's internal needs. They do not occur on an instantaneous type basis. They develop gradually within the basic personality structure of the individual. Neither does the affect separate itself off on an instantaneous basis and become attached to new areas of ideas on an instantaneous basis. It's a long process of withdrawing the affect from external objects and losing interest in them and then entering into behavior which is not of a social synthetic kind, and it just is not an immediate affair.'' Untrained observers, however, would not have noticed or appreciated the significance of this slow deterioration.

On the precise question at issue, Dr. Smith conceded that not all schizophrenics are incapable of forming an intent to kill, of premeditating, or of harboring malice. But the doctor was of the opinion that this particular individual, because of the extent and duration of his illness, did not have the capacity to give careful thought to and weigh the considerations for and against killing his parents, or to maturely and meaningfully deliberate and reflect upon the gravity of his contemplated act.

Nor was defendant's apparent ''method in his madness'' inconsistent with this conclusion. Dr. Smith explained that the offense was the ''direct product'' of the ''ideational content of his disease''; he was acting ''under the imperative demand of his delusional system and his hallucinations,'' and any seeming plan was simply his minimal effort to respond to ''whatever is being communicated to him from his disturbed thinking.'' For example, even if the trick of bolting a door from the outside had been demonstrated to him in the manner testified to by the prosecution witnesses, ''his reaction to what he had seen would be subject to modification in his delusions, his belief that this was all right to go ahead and do what he wanted to do; subject to modification [by] what his voices said to him.''

Dr. Nicholas M. Langer, a psychiatrist, conducted a series of seven examinations of defendant, each lasting approximately two hours. He also caused defendant to be examined

---

That's where the hallucinations exist. They meet the internal needs of somebody in a way that gives them some sort of relief from frustration, some sort of satisfaction, some way to continue to exist. . . .

''He had to use these abnormal ways of being equal to other people to exist in this world; and even at that, it was so falsified by the presence of these abnormal mental trends that he wasn't really in the world. He was in his own world.''

by Dr. Trent Bessent, a clinical psychologist, to determine *inter alia* whether defendant had any tendency to lie, distort or conceal the truth; the results of the tests showed no such tendency.[5]

Dr. Langer described defendant as a youth of very slight build, weak musculature, and remarkably myopic; he was able to answer questions intelligently, but talked in a somewhat slurred speech. There was "almost a complete absence of affect" as defendant related to him the events in issue. He told the doctor that he had been at school about a week before the shootings, listening to music in the record library, when the voice of "Christopher Chamberlain" told him to take a piece of paper and write out the "plan." He did it quickly, and told the doctor "I don't remember what I wrote on the note. Everything was jumbled up." Apparently he bought the gun, but did not think further about it. On the night before the shootings, however, "He [i.e., "Christopher Chamberlain"] wouldn't let me sleep"; instead, defendant lay awake "and looked at the bright little stars." The next morning he decorated the family's aluminum Christmas tree, and had a rare fit of anger because the tree was artificial, symbolizing to him the cold, unemotional spirit of contemporary Christmas.

In attempting to describe the actual killing of his parents, defendant said he put the gun to his mother's head and "one minute she was standing there and the next minute she was gone. Disappeared. . . . After the first shot I was dazed and sort of faint by the explosion, then I felt like things rushed very fast. Seemed like a quarter of a second. Then I went— then when I saw my father kneeling I felt happy because he was in pain. I thought that he was in greater pain that anybody I ever saw. She was his whole life. The only one he ever cared for. They used to fight but really loved each other. I felt nothing. Just like looking at a picture in a magazine." Defendant further said that the officers arrived and "took him

---

[5]In a report to Dr. Langer on these tests, Dr. Bessent concluded that defendant had an IQ of 115 or "high average." He "tends to experience failure in his interpersonal relationships largely because of his lack of maturity. In relating to others he is not able to respond in a mature manner, so he meets with rebuff, with failure, and tends then to withdraw . . . into an immature fantasy life." He is a youth "of potentially superior intelligence whose functioning is impaired by tension and anxiety which are expressed in obsessive compulsive defenses and passivity. Residuals of underlying schizophrenic process are present and passive child-like in desires as well as more passive identifications are present. Constructive expression of aggression has not been learned."

to the police station, and they told him all kinds of mumbo-jumbo about his rights, and they took his boots away and told—the police told him if he confessed that he did it it would be so much easier.'' Afraid of receiving a beating, defendant told the police ''I did it because I thought they were hypocrites and that I certainly had the right to do it, to eradicate them. When my sister came to see me she was crying and it felt so good to see her suffering. I was very happy that day.''

Dr. Langer presented and analyzed a life history of defendant. As a child, he was incapable of playing and competing with his peers because of abnormally insufficient physical development and poor coordination. He had no friends, and his schoolmates ridiculed and rejected him. He turned to his parents for help, but apparently received little affection and even less understanding. Throughout his early years his attitude towards his parents vacillated abruptly between love and hate, but the latter inexorably gained the upper hand. Although defendant suppressed any overt act of hostility, his internal tensions expressed themselves in other ways: in particular, he was frequently disturbed by habits of his father which a normal child would have overlooked or forgiven.[6]

Unable to relate to either his peers or his parents, defendant took refuge in a fantasy world. At the age of five or six he was given a toy panda; he told Dr. Langer that ''It was white and red and I liked it very much and kept it until I was arrested. I put it to bed and slept with it. I felt comfortable with it. Without it I felt nervous.'' As a teenager, he painted a portrait of a face on the back of a large map hanging in his room. Outlined in charcoal, it had burning red pupils set in chalk-white eyes.[7] Whenever defendant became angry with his parents he would retire to his room, close the drapes, turn the picture outwards from the wall, and sit staring at it for long periods of time. He explained to Dr. Langer that ''Sometimes I would sit at my antique pump organ playing slow music while watching the picture. When I was in blue mood, de-

---

[6]For example, he repeatedly complained to the doctors of the fact that his father ate with his mouth open, and smoked and drank in secret although he purported to be a devout Mormon. He also complained that when he was 14 or 15 his father ''bought six little ducks for me for Easter and about six months later he killed them. Just chopped their heads off, and he wanted me to help him clean them and to eat them. This was the most cruel thing to do to my ducks. It's like burning down my house.''

[7]The picture was produced by defense counsel, identified by the witness, and subsequently introduced into evidence.

pressed, or worried, I would look at it. When I was in either mood I would feel better after looking at it. It pacified me. . . . When I looked at it, I could sort of lose the world. It was as if the eyes were a door. I could climb through those doors and be in a beautiful quiet woodland in another world."[8] The doctor commented, "A picture like this speaks more eloquently about a person's emotion, inner world, mind, and thinking than any word could describe, and I wish to point out those two little red spots in the pupils of those eyes. He saw a glowing in the darkness, and these were the eyes that opened up for him and gave him a chance to go into his own inner world of fantasy to find peace within himself. . . . And one of the most interesting statements he made in connection with this picture was, 'Somehow the picture made me think maybe everything wasn't against me.' He was groping for some hope. He was groping for somebody or something to set him straight."

But no hope was forthcoming. At the age of 13 or 14 his father discovered him apparently talking to himself, and "He thought it was funny." His English compositions in high school were so bizarre that his teacher advised him to see a psychiatrist.[9] He desperately sought help from his mother; but as he reported to Dr. Langer, "I used to tell her about my weird feelings, [that I felt] like a drunk, and she would say I would outgrow them. Once I told her I should go to see a psychiatrist. I even thought to go to see one by myself but I never made it. Didn't have the courage."

By this time defendant was firmly under the command of his auditory hallucinations. Dr. Langer explained that "This is something that he has been doing actually from early childhood on. And as I brought out in my study of him, at the age of 10 or 11 he became aware of this, that he had always conversed with what he thought first were his own thoughts.[10]

---

[8]Similarly, defendant would visit cemeteries every day on the way to or from school, trying to find the peace of mind that he longed for "with such a tremendous intensity."

[9]The teacher testified that his work "would appear to be the writings of a mentally retarded child. They were full of violence of the comic book variety, the dripping dagger sort of thing. . . . And the fact that he was so shy and withdrawn in class and so aggressive in a blood-chilling way in his papers, I remembered this as being very, very strange." Although defendant was then in high school, the teacher estimated that his writings were at the age level of an 8 to 10-year-old.

[10]Another of defendant's school teachers testified that in 1957—i.e., at the age of 11—it was specifically reported of defendant that he "talks aloud to himself for lengthy periods." The teacher added that it was

Later on he reached a point where he differentiated these various voices, and . . . for his own use, in his own world, he gave them four different names.'' Two of the voices were ''friendly'' and two were ''unfriendly''; of the latter, ''one belonged to Christopher Chamberlain, and this was the one that he kept on hearing almost constantly. And this voice also told him all kinds of weird things.''

In particular, 'the voice of ''Christopher Chamberlain'' began telling him to kill his parents. When he was 10 or 11 he heard ''loud'' thoughts saying he should put rat poison into his father's drink; at age 14 he made a doll representing his father and pushed pins into it; at 15 or 16 he wanted to ''kill him with a rolling pin, wrap him in his bedspread, put him in his car, and roll it down the hill.'' Defendant also told Dr. Langer that a boy at school had mentioned he knew how to make car brakes inoperative, and ''I thought of asking him to teach me this so that I could fix their car. Then I thought of learning hypnosis so I could hypnotize them to drive on the wrong side of the road. I thought to kill her, too, with the rat poison since occasionally both of them drank. I actually bought a book on hypnosis. It cost $1 but it was rather disappointing.''

Of the making and executing of the final plan, defendant could tell Dr. Langer only that ''I had to do it. It was Christopher Chamberlain who told me.'' The doctor analogized defendant's mental condition at the time to that of a person who has been placed in a hypnotic trance: neither ''really knows what he is doing let alone why he is doing it. One is an outside command, the other one is a command that is coming from within, but he has no power to resist it, and in this particular case [it] coincided with his own pathological trend of mind.'' Like Dr. Smith, Dr. Langer concluded that defendant did not have the mental capacity to give careful thought to and weigh the considerations for and against killing his parents, to form an intention to kill unlawfully, or to meaningfully and maturely deliberate and premeditate and reflect upon the gravity of his contemplated act and to harbor malice aforethought. Summing up, Dr. Langer stated that

---

''almost a daily thing,'' during which ''he went through the actions you would normally associate with both answering questions and at the same time asking questions, as though he were talking, either reliving conversations that occurred some place else, or engaging in some conversation with somebody whose presence wasn't apparent to me.'' The habit was so marked as to disturb his classmates and bring ''a great amount of ridicule'' on him.

"the gravity of this defendant's mental illness left practically very little, if any, time for him to be free of his delusions and hallucinations. For practical purposes it could be stated that anything and everything he said or did was the outcome of his deranged mind."[11]

Dr. Joseph Krofcheck, a psychiatrist, examined defendant two months after the killings. The examination lasted approximately two hours, and was directed to determining defendant's current mental condition. In Dr. Krofcheck's opinion defendant was suffering from paranoid schizophrenia. Such a person, the doctor testified, "becomes so concerned with his own inner feelings and thoughts he gives less credence to the reality of the . . . actions of people and objects in the surrounding environment. And soon is unable to tell the difference what is originated from within him and what he experiences in the outside world, and this becomes the dominant theme and the basis of his almost, you could say, his philosophy of life."

Like Drs. Smith and Langer, Dr. Krofcheck concluded that defendant did not have the mental capacity to weigh and consider the reasons for and against killing his parents, or to meaningfully and maturely deliberate and premeditate or reflect upon the gravity of his contemplated act and to harbor malice aforethought. Explaining his opinion, Dr. Krofcheck pointed out that during the examination defendant's "affect was grossly inappropriate to what he was saying"; he appeared to be hallucinating at the time, and suffered from delusions both of grandeur and of persecution. The doctor found that defendant "was very ill, and it was not an illness that was sudden. It had been an illness that was present for quite some time."[12] Asked why defendant was apparently able to perform such deliberate activity as driving his motor

---

[11]Rather than finding in defendant's "plan" a capacity to deliberate and premeditate, Dr. Langer was of the opinion that it illustrated his mental illness in that defendant proceeded to leave all the incriminating evidence—e.g., the note, the bullets, the sales slips, the gloves, and the plastic bag—in his nearby bedroom and hallway: "A little boy when he . . . steals cookies from the cookie jar could have more successfully concealed his act than [the way] this so-called plan was carried out." Defendant's voice had not instructed him how to dispose of the evidence, and he had "confidence that everything will be all right. . . ."

[12]Explaining further, Dr. Krofcheck testified that "In the development of this kind of an illness the symptoms that were demonstrated by the patient are not symptoms that come on suddenly or overnight. They are a result of a long-standing pathologic process within him, of altered relationships between him and significant people like his parents, the result of unrewarding relationships with his peers, being rejected by his

scooter shortly before the killings, Dr. Krofcheck warned that we must "recognize that we are dealing with a totally sick individual, and all of the areas of function would be impaired. There would be some areas where he would appear to be [more] normal than other areas, and in the areas that had to do with his delusional system, or the center, or say core of his pathology, there would be as if he were being programmed." But defendant did not "fluctuate" between his fantasy world and a conscious awareness of reality; rather, he lived in the former and at most might "permit an intrusion into his world and respond to it," yet would attach no value to either the question or the person asking it.

*The prosecution's rebuttal.* If the case had gone to the jury on the foregoing evidence alone and had resulted in verdicts of murder in the first degree, we would have been compelled to find it insufficient under the authority of *People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959], and *People* v. *Ford* (1966) 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132]. To forestall such a ruling, the prosecution undertook to create a "conflict" in the psychiatric evidence.[13]

The testimony of each of the first two experts called by the prosecution, Dr. George Y. Abe and Dr. Edwin E. McNiel, was virtually identical. Neither had examined defendant in person; both had read various documentary materials pre-

---

friends, playmates, and this whole process continually goes on and on. It reenforces itself and continues to grow worse.

"And when I saw Fred I think this was like the end of the road, . . . as far as he could go without completely not knowing who he was, where he was, or anything that was happening to him."

[13]The prosecution also introduced lay evidence on this issue. There was, for example, a circumstantial effort to show an insurance motive for the crimes. Evidence was presented of defendant's satisfactory performance in his college classes, but such abstract intelligence is not inconsistent with the defense in this case; indeed, one of the prosecution's own psychiatrists testified on cross-examination that "In general, this illness [i.e., paranoid schizophrenia] is more apt to . . . afflict people who are of higher intelligence." From the content of a psychology course taken by defendant, the titles of several books he checked out of the college library, and similar evidence, the prosecution sought to insinuate that he had learned enough about the illness to feign the symptoms observed in his medical examinations; even the prosecution's experts, however, were confident of the ability of a psychiatrist to expose a malingerer of this kind, commenting that "Usually you can trip these people up in one way or another." Finally, there was testimony that defendant "appeared normal" to various nonexpert witnesses—including his older sister, whom he had wanted also to kill and who admitted she would "like" to "see him die" for killing their parents. There was no dispute among any of the psychiatrists, of course, that a person can suffer from paranoid schizophrenia for a long time without his illness being detectable by untrained, lay observers.

pared prior to trial;[14] and both were presented with a lengthy set of "hypothetical" facts by the prosecutor. After purporting to summarize substantial portions of the evidence thus far introduced, the prosecutor asked each witness if, "based on these assumed facts," he had an opinion whether defendant had the mental capacity to deliberate and premeditate, to give careful thought to and weigh the considerations for and against killing his parents, to maturely and meaningfully reflect upon the gravity of his contemplated act and to harbor malice aforethought. Each replied that he did have such an opinion; when asked to express it, each stated that he believed defendant did possess the described capacity. The third expert called by the prosecution, Dr. Marcus Crahan, was one of the court-appointed psychiatrists and hence had examined defendant upon his plea of not guilty by reason of insanity (*ante,* fn. 1); in the light of that examination he was asked the same questions as Drs. Abe and McNiel with respect to defendant's mental capacity, and he gave the same brief answers.

Defendant earnestly contends that the evidence is insufficient to support the verdicts of murder in the first degree. ▮ The rules governing our resolution of this issue are now well settled: "The determination of the degree of the crime is, of course, generally left to the discretion of the jury. Upon appeal, the reviewing court is bound to view the evidence most favorably in support of its judgment. (*People* v. *Simpson,* 43 Cal.2d 553, 571 [275 P.2d 31].) But the jury's discretion is not absolute. (*People* v. *Tubby,* 34 Cal.2d 72, 76 [207 P.2d 51].) Recently, in *People* v. *Hall,* 62 Cal.2d 104, 110 [41 Cal.Rptr. 284, 396 P.2d 700], we reaffirmed the principle first stated in *People* v. *Holt,* 25 Cal.2d 59, 70 [153 P.2d 21], that 'Implicit in our duty to determine the legal sufficiency of evidence to sustain a verdict is our obligation, in a proper case, to appraise the sufficiency and effect of admitted or otherwise indubitably established facts as precluding or overcoming, as a matter of law, inconsistent inferences sought to be derived from weak and inconclusive sources.' (See also Jaffe, *Judicial Review: Question of Fact,* 69 Harv.L.Rev. 1020, 1026-1031.) ▮ Since the amendment of Penal Code section 1181 in 1927, this court is empowered to modify the

---

[14]I.e., the reports of Drs. Crahan, Smith, Langer and Bessent; defendant's Atascadero file; the sheriff's report of the shootings; defendant's confession to the police; and the transcript of the preliminary hearing.

138

judgment and fix a lesser degree of the crime in those instances where *on an appraisal of all the evidence* there is found to be lacking any *substantial* evidence of the elements required to constitute the degree of the crime as fixed by the jury. (*People* v. *Tubby, supra,* 34 Cal.2d 72, 76, and cases cited therein.)'' (Italics added.) (*People* v. *Ford* (1966) *supra,* 65 Cal.2d 41, 51.)

As the emphasized language indicates, our task in this regard is twofold. First, we must resolve the issue in the light of the *whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by the respondent.[15] Second, we must judge whether the evidence of each of the essential elements constituting the higher degree of the crime is *substantial*; it is not enough for the respondent simply to point to ''some'' evidence supporting the finding, for ''Not every surface conflict of evidence remains substantial in the light of other facts.'' (*People* v. *Holt, supra,* at p. 70 of 25 Cal.2d.)

There is, of course, nothing new in the latter requirement. In the leading civil case of *Crawford* v. *Southern Pac. Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183], this court restated the fundamental rule that ''when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury.'' Quoting this language, we emphasized in *Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689], that ''The critical word in the definition is *'substantial'*; it is a door which can lead as readily to abuse as to practical or enlightened justice.'' Seeking to determine the meaning of ''substantial'' in this connection, the court in *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54], canvassed dictionary and judicial definitions and concluded that the term ''clearly implies that

---

[15]Thus in *People* v. *Holt* (1944) *supra,* 25 Cal.2d 59, there were, as here, certain items of evidence which might ''seem by themselves, at first impression, to establish a willful, deliberate and premeditated intent to commit murder. Viewing that evidence superficially, it would appear possible to so hold and so dispose of this appeal. But in determining whether the life of the defendant legally is forfeit in expiation of his crime the jury was not free to isolate such specifically mentioned items of evidence from all the other related facts and circumstances.'' (*Id.*, at p. 69.) And ''To the extent that the character of a particular homicide is established by the facts in evidence the jury is bound, as are we, to apply the standards fixed by law.'' (*Id.*, at p. 90.)

such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case.''

The same standards control, *a fortiori,* when it is a criminal judgment which is challenged on the ground of insufficiency of the evidence. In resolving that contention the appellate court is required to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt. (*People* v. *Hall* (1964) *supra,* 62 Cal.2d 104, 109-110, citing *People* v. *Huizenga* (1950) 34 Cal.2d 669, 676 [213 P.2d 710].) ■ The prosecution's burden is a heavy one: ''To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence.'' (*People* v. *Hall, supra,* at p. 112.) ■ Accordingly, in determining whether the record is sufficient in this respect the appellate court can give credit only to ''substantial'' evidence, i.e., evidence that reasonably inspires confidence and is '' of solid value'' as the court said in *Teed.*

While this test has perhaps most frequently been invoked in holding insufficient the evidence of identity purporting to connect the defendant with the crime (*People* v. *Hall, supra;* *People* v. *Gould* (1960) 54 Cal.2d 621, 630-631 [7 Cal.Rptr. 273, 354 P.2d 865] ; *People* v. *Jackson* (1965) 238 Cal.App.2d 477, 479-480 [47 Cal.Rptr. 860] ; *People* v. *Singh* (1936) 11 Cal.App.2d 244, 254 [53 P.2d 403] ), it is equally applicable to all elements of the prosecution's case (*People* v. *Jackson* (1955) 44 Cal.2d 511, 517 [282 P.2d 898] [aggravated kidnaping; no showing of ''bodily harm''] ; *People* v. *Rodriguez* (1960) 186 Cal.App.2d 433 [8 Cal.Rptr. 863] [manslaughter; no showing of criminal agency causing death]) and in particular to its burden of proving that the defendant committed the allegedly criminal act with the requisite specific intent or other state of mind (*People* v. *Tatge* (1963) 219 Cal.App.2d 430 [33 Cal.Rptr. 323] [abortion; failure to prove defendant's knowledge of pregnancy or intent to induce a miscarriage] ; *People* v. *Tidmore* (1963) 218 Cal.App.2d 716, 720 [32 Cal.Rptr. 444] [burglary; failure to prove that entry was made with intent to commit rape] ; *People* v. *Ravel* (1953) 122 Cal.App.2d 312 [264 P.2d 610] [grand theft; failure to

prove intent to steal]; *People* v. *Alkow* (1950) 97 Cal.App.2d 797 [218 P.2d 607] [embezzlement; same]).

In the case at bar we have already undertaken to examine the "whole record" on this issue, and have set forth at some length the psychiatric evidence showing that defendant lacked the necessary mental capacity to be guilty of murder in the first degree. We must now determine whether the psychiatric testimony introduced by the prosecution to rebut that evidence was "substantial" within the meaning just discussed.[16]

We begin with the testimony of Drs. Abe and McNiel. As noted, neither had examined defendant in person, and both testified on the basis of a lengthy hypothetical question posed by the prosecutor.[17] There is no doubt that their *conclusions* were so phrased as to support the jury's implied finding of mental capacity: on the present record we cannot fault the prosecution, as the court did in *Goedecke* (at p. 857 of 65 Cal.2d) and *Nicolaus* (*id.* at p. 878), for a failure to elicit "psychiatric testimony as to the *extent* to which defendant could *maturely* and *meaningfully reflect* upon the gravity of his contemplated act." (Italics in original.) The prosecutor, like the defense counsel before him, formulated his questions in those exact words, and received the expected affirmative answers.

But we do not here sit in judgment on a medieval trial by oath. A man's life, in our system of justice, cannot be made to depend on whether or not the witnesses against him correctly recite by rote a certain ritual formula. There is no magic in the particular words emphasized in *Goedecke* and *Nicolaus:* the court was there concerned, rather, with the prosecution's failure to introduce expert *proof* on the issue we thus described, i.e., the extent of the individual's capacity to reflect on the gravity of his proposed act. In the case at bar, therefore, we cannot call a halt to our inquiry merely because the prosecution's experts uttered the "correct" words; we must

---

[16]The disagreement of the present author with the majority in *Goedecke* and *Nicolaus* flowed from his conclusion that the prosecution's evidence in each of those cases was "substantial" in this sense. (See *People* v. *Goedecke,* 65 Cal.2d at p. 862; *People* v. *Nicolaus, id.* at p. 884.)

[17]It is true that each had also read various documents in the case, including the pretrial medical reports. (*Ante,* fn. 14.) But neither had been present in the courtroom to hear the detailed testimony of Drs. Smith, Langer, Bessent, and Krofcheck, discussed hereinabove, in which these experts analyzed and explained the conclusions embodied in their reports.

press on, and determine the substantiality of the proof which that testimony purported to represent.

In evaluating expert evidence in this light, our duty is again twofold. "Mental illnesses are of many sorts and have many characteristics. They, like physical illnesses, are the subject matter of medical science. They differ widely in origin, in characteristics, and in their effects on a person's mental processes, his abilities, and his behavior. To make a reasonable inference concerning the relationship between a disease and a certain act, the trier of the facts must be informed with some particularity. This must be done by testimony. Unexplained medical labels—schizophrenia, paranoia, psychosis, neurosis, psychopathy—are not enough. Description and explanation of the origin, development and manifestations of the alleged disease are the chief functions of the expert witness. The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion; in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant; it does not lie in his mere expression of conclusion." (Italics added.) (*Carter* v. *United States* (D.C.Cir. 1957) 252 F.2d 608, 617 [102 App.D.C. 227].) ▮▮▮ In short, "Expert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the *facts* and the validity of the *reasons* advanced for the conclusions." (Italics added.) (*People* v. *Martin* (1948) 87 Cal. App.2d 581, 584 [197 P.2d 379]; accord, *People* v. *Jones* (1964) 225 Cal.App.2d 598, 611 [37 Cal.Rptr. 454].) Here, the testimony of Drs. Abe and McNiel was deficient in both emphasized respects.

▮▮▮ To begin with, of the eight psychiatrists, one general practitioner, two psychologists, and one psychiatric technician who testified at various phases of this trial on the issue of defendant's mental condition, it is significant that Drs. Abe and McNiel were the only witnesses who had not examined defendant in person. The testimony of the experts called by the defense, as we have seen, was predicated upon many cumulative hours of private, professional confrontation with defendant, provoking his reactions, observing his demeanor, and listening to the intonation of his responses. By contrast, both Drs. Abe and McNiel conceded on the stand that they had never talked with this defendant, and the record does not

disclose they had ever seen him until they entered the court-room to testify against him.[18]

We do not presume to advise members of another profession in the conduct of their practice. Nevertheless, a distinguished federal court recently surveyed the medical writings on this subject, and concluded: ''The basic tool of psychiatric study remains the personal interview, which requires rapport between the interviewer and the subject. Gill, Newman & Redlich, The Initial Interview in Psychiatric Practice (1954). See also Finesinger, *Psychiatric Interviewing*: *Principles and Procedure in Therapy*, 105 Am.J.Psychiat. 187 (1948). More than three or four hours are necessary to assemble a picture of a man. A person sometimes refuses for the first several interviews to reveal his delusional thinking, or other evidence of mental disease. Menninger, A Manual for Psychiatric Case Study, ch. 1-4 *passim* (2d ed. 1962) (hereafter cited as Menninger). See Noyes & Kolb, Modern Clinical Psychiatry, ch. 7 (with bibliography); Knight, *Borderline States*, 17 Bull. of Menninger Clinic 1, 8 (1953). Paranoid patients particularly may be able to guard against revealing their disorder with extraordinary skill. Menninger 64-65. See Noyes & Kolb, Modern Clinical Psychiatry 112-13. From hours of interviewing, and from the tests and other materials, a skilled psychiatrist can construct an explanation of personality and inferences about how such a personality would react in certain situations. And he can explain his findings in nontechnical terms to a jury.'' (Fn. omitted.) (*Rollerson* v. *United States* (D.C.Cir. 1964) 343 F.2d 269, 274 [119 App.D.C. 400] (per Bazelon, C. J.).)

The record before us amply bears out this appraisal of the value of a personal examination in cases of this nature. Many of the diagnostic facts related by the defense psychiatrists—e.g., defendant's physical inadequacy, recurring auditory hallucinations and flattened affect—were learned from or confirmed by observing him in the course of the interview. The defense witnesses each stressed the importance of such non-verbal ''communication'' from the patient;[19] indeed, on this point the experts were in effect unanimous, for Drs. Abe and

[18]Both witnesses conceded they did not ask defense counsel for the opportunity to personally examine defendant prior to trial. They explained that they ''understood'' from discussions with the district attorney's office that this was ''not usually done,'' but we see no impropriety in the making of such a request, and here there was no indication that permission would be refused.

[19]Dr. Smith testified: ''There's more to what he tells you than the content of it or whether it's the truth or not. There's the way he tells it,

McNiel left no doubt on cross-examination that their regular practice was to conduct personal examinations and that they would have preferred to do so in this case. Thus Dr. Abe agreed that the "inflections in [the patient's] voice," his "facial expressions," and his "overall demeanor" can be "quite significant" in reaching a diagnosis.[20] Similarly, Dr. McNiel testified that an experienced psychiatrist can often make an accurate preliminary diagnosis by "observing" the patient: "you come to watch people and how they walk and how they talk and how they are dressed and what they say." The witness was quite emphatic that a personal examination was a proper part of diagnostic procedure, stating that "it's just part of your job. I think it's the way to do it." He agreed that the examiner thereby "gains more of an insight into the situation," and concluded that in the present case "I would be happy to examine the man."[21]

the inflections, the behavior that goes with it, the emotional attachment, if any, to it, the appearance of the patient in making the utterance. There are other ways of communicating than the spoken word."

Dr. Langer testified: "this is the role of an expert examiner to observe him, to watch him, to scrutinize him, and to evaluate everything he says, the way he says, the way he says it, the intonation of his voice, the reaction of his facial muscles, eyes, . . . ."

Dr. Krofcheek testified: "he was communicating to me more than just with words. I was very much aware of the non-verbal cues that go along with the stated words, like his body posture, his facial expression, the use of particular words, the way he used them, his tonal inflection, the change of emotions as he was talking, the appropriateness of a feeling or emotion as it's hooked up with content. . . . I think it's important to recognize that the stated word, the content, is just one of many other parameters of the communication, and it's not any one thing that I look at or look for, but it's a synthesis of the total information that I'm getting from him, which includes all of the non-verbal cues and non-verbal language as well as the stated words."

[20]For example, when asked how a psychiatrist can determine if a patient is suffering from auditory hallucinations, Dr. Abe explained: "Now, some of the ways that you can do this is the way he relates to you. How does he talk? Now, if he is relevant and coherent and quite [in contact] with reality, then generally speaking you would think not in terms of his delusions or hallucinations because if he is beset with this sort of hearing voices, for example, he is going to be distracted. He may look around. He may turn away from me right in the middle of a sentence and even say, 'What?' All kinds of things can be manifested. But in an interview situation where the individual is quite perceptive of what you are saying and is able to answer in a relevant and coherent fashion, at least at that moment you can say he is not hearing voices, most likely. He may have hidden the voices and concentrate, but he can't do this for very long."

Dr. Abe conceded in the sanity phase of this trial that in none of his more than 3,000 court appointments under an insanity plea would he have consented to form an opinion without a personal confrontation with the defendant.

[21]Not having conducted such an examination of defendant, of course,

Even more inadequate than the factual basis of the testimony of Drs. Abe and McNiel is their statement of the *reasoning* by which they assertedly progressed from the facts to their conclusions. ■ It is settled that "In this class of case, as in any other, the opinion of an expert is no better than the reasons upon which it is based." (*People* v. *Williams* (1962) 200 Cal.App.2d 838, 845 [19 Cal.Rptr. 743].) And the chief value of such an expert's testimony, we reiterate, lies "in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant; . . ." (*Carter* v. *United States* (D.C.Cir. 1957) *supra,* 252 F.2d 608, 617.)

■ From the portions of the record quoted and summarized hereinabove it is evident that the psychiatric witnesses called by the defense conscientiously undertook to present such an explanation to the jury. They supported their conclusions by detailed explorations into defendant's childhood, family life, and adolescent behavior; they provided instructive analyses of the nature of paranoid schizophrenia, and painstakingly interpreted the significance of defendant's delusions and hallucinations. Only by such an effort could the hidden wellsprings of this bizarre tragedy be brought to light.

In sharp contrast, however, is the showing of Drs. Abe and McNiel. Their meager testimony provided essentially no "reasons" whatever for their conclusions: after flatly asserting that defendant had the mental capacity described, each wit-

---

Drs. Abe and McNiel were compelled to base their opinions largely on the "hypothetical" set of facts recited to them by the prosecutor. Although the hypothetical question has traditionally been the method used for taking opinion evidence of an expert witness, it has long been damned with faint praise. Thus in *People* v. *Le Doux* (1909) 155 Cal. 535, 554 [102 P. 517], this court observed that: "The best way to obtain the opinion of an expert witness upon a matter which is the subject of expert evidence, is through the medium of a hypothetical question. *Unsatisfactory as that method unquestionably is,* it is the least objectionable known to the law." (Italics added.) (Accord, *People* v. *Wilson* (1944) 25 Cal.2d 341, 348 [153 P.2d 720].) Wigmore denounces the device in no uncertain terms: "The hypothetical question, misused by the clumsy and abused by the clever, has in practice led to intolerable obstruction of truth." It has "artificially clamped the mouth of the expert witness" and tended to both mislead and confuse the jury, "so that its employment becomes a mere waste of time and a futile obstruction." (2 Wigmore on Evidence (3d ed. 1940) § 686.) More recent writers bluntly suggest that "the remedy to this sort of abuse lies in the ability of the knowledgeable expert to reply: 'I have no opinion as to your hypothetical man, for he has nothing to do with the facts of this case.' " (Dieden and Gasparich, *Psychiatric Evidence and Full Disclosure in the Criminal Trial* (1964) 52 Cal.L.Rev. 543, 557 fn. 46; see also *id.* at p. 556.)

ness merely agreed with the prosecutor that a person with a truly severe case of paranoid schizophrenia "would not have been able" to make the detailed plan followed by this defendant or to take adequate notes, as he did, in college-level philosophy and psychology classes. Yet neither witness attempted to refute the mass of defense evidence explaining that defendant's apparent "plan" was the product not of his free will but of the imperative demands of his delusional system and hallucinated voices; and neither witness sought to harmonize his reliance on defendant's classroom performance with the evidence (see fn. 13, *ante*) that at defendant's stage of this illness he could still accomplish such abstract intellectual tasks as writing class notes. Moreover, although the filed reports of Drs. Crahan, Smith, Langer, and Bessent reached reasoned conclusions directly contrary to their own, Drs. Abe and McNiel merely agreed with the prosecutor that nothing in those reports "would alter" the opinions they had just pronounced on the witness stand: no effort was made to discuss the facts recited in the reports, or to dispute the inferences drawn from those facts. Thus in the case at hand, as in *People v. Williams* (1962) *supra,* 200 Cal.App.2d 838, 845, "the opinions of both [prosecution psychiatrists] were offered as if it were their principal function merely to tell the jury what its verdict should be on the issue of premeditation. Why [each] was not questioned on direct examination to bring the reasons for his opinions into focus for the edification of the jury is not clear. Such questions are proper."

In appraising the substantiality of this evidence we find guidance in two civil cases dealing with the related issue of the mental capacity of a testator to make a valid will. In *Estate of Powers* (1947) 81 Cal.App.2d 480 [184 P.2d 319], a jury determined that the testatrix lacked such capacity. The trial court refused to revoke probate notwithstanding the verdict, and on appeal the question presented was "whether as a matter of law there was no substantial evidence to support the jury's finding. . . ." Two doctors had given expert testimony in accord with that finding. The Court of Appeal observed, however, that "Neither of them ever saw the testatrix and their testimony was based entirely upon a reading of the hospital records," and furthermore "they did not accept the hospital records *in toto* as the basis for their expressed opinions, but rather accepted only those portions of the hospital records which supported their opinions and rejected those portions which contradicted their opinions." Affirming the

order notwithstanding the verdict, the court concluded (at pp. 485-486) that ''It is impossible for any expert basing his testimony solely upon other evidence introduced in the case thus to lift himself by his own bootstraps. If his opinion is not based upon facts otherwise proved, or assumes facts contrary to the only proof, it cannot rise to the dignity of substantial evidence. [Citations.]''

Again, in *Estate of Teed* (1952) *supra,* 112 Cal.App.2d 638, the trial court, sitting as trier of fact, found that the testatrix lacked the mental capacity to make a will, and accordingly refused probate. The sole issue on appeal was the substantiality of the evidence to support that finding. After brushing aside various items of lay evidence as either inconclusive or irrelevant, the court turned to the expert testimony of two doctors who had found an absence of the requisite mental capacity. The first doctor had not examined the testatrix for six months prior to the execution of the will. The second doctor, a psychiatrist, had never seen the patient at all; like the prosecution psychiatrists in the case at bar, this witness was therefore compelled to express his opinion as to mental capacity on the basis of a hypothetical question, and on cross-examination be admitted that ''It is always desirable to form your own opinion from your observations and examination.'' (*Id.* at p. 643.) The Court of Appeal reversed on the ground of a lack of substantial evidence to support the finding of testamentary incapacity, observing (at p. 646) that ''the *ipse dixit* of the most profound expert proves nothing except [as] it finds support upon some adequate foundation.''

We conclude that the opinion testimony of Drs. Abe and McNiel cannot be deemed ''substantial'' evidence to support the implied finding of defendant's mental capacity on the guilt phase of this trial.[22]

 The testimony of the third expert witness called by the prosecution, Dr. Crahan, was deficient in a very different respect. On direct examination Dr. Crahan briefly stated his opinion that defendant had the mental capacity to premeditate and deliberate, to maturely and meaningfully reflect on

---

[22]We do not imply, of course, that the testimony in question was *inadmissible.* Assuming the necessary minimum acquaintance with the case in which he is called to testify, ''the extent of an expert's knowledge goes to the weight of his testimony, rather than to its admissibility'' (*Estate of Schluttig* (1950) 36 Cal.2d 416, 424 [224 P.2d 695]). And this rule has recently been applied to the sanity testimony of a psychiatrist who was not permitted to conduct a personal examination of the defendant. (*People* v. *Brekke* (1967) 250 Cal.App.2d 651, 661-662 [58 Cal. Rptr. 854].)

the gravity of his contemplated act, and to harbor malice aforethought. On cross-examination, however, he readily acknowledged that in his report to the court upon the insanity plea (*ante*, fn. 1) he had concluded that defendant was "totally without moral insight into the nature of his act," that the act was "triggered by a delusion," and that he was "legally insane" at the time he committed it. Far from repudiating those views, Dr. Crahan expanded upon them in his testimony: he explained that defendant "had what we call a savior complex. He believed to the point of delusion, I think, that his parents were hypocrites in their religion and therefore should be destroyed. He was the instrument of that destruction, and I believe that was a delusion"; that "his whole plan was probably the result of this delusion"; and that "this delusion was ruling his behavior." On the obvious question of whether defendant's delusional system left him any capacity of weighing various alternative forces of conduct, the following colloquy took place:

"Q. [By defense counsel] Doctor, was the result of this delusional system, let's say, directed towards a particular course of action? Is it likely that he is without, let's say, free choice to change that course of action if he is strictly operating within this delusional system? A. He believes himself to be comparable to God and to be able to control the lives of these people because he has passed judgment on them. That is the delusion. It is as simple as that.

"Q. Then wouldn't it be fair to say that in that sense he was stripped of reason? A. Relative to that area, yes.

"Q. And wouldn't you say that, in that sense, he was robbed of his power of free choice, in that sense? A. In a sense, yes.

"Q. So, then, if he was premeditating or carrying on deliberations, wouldn't you say this was within that delusional system? A. No. He could plan to execute these people quite logically and rationally because he felt he was justified in doing so, but his premeditation and his planning would be rational and sane."

In short, Dr. Crahan was of the opinion that defendant could both "be legally insane and premeditate."[23]

---

[23]Consistently with this attitude, Dr. Crahan testified *for the defense* on the sanity phase of the trial. After a lengthy analysis of defendant's condition, the doctor concluded that at the time of the killings he did not have sufficient mental capacity to understand the nature and quality of his act or to distinguish between right and wrong in relation to that act.

148

The only inference we can draw from such testimony, however reluctantly, is that the witness was misled as to the meaning of the crucial term, "premeditation." Whatever that word may have signified prior to our *Wolff* decision, we there made it clear that the true test in this regard is not simply an adequate time to deliberate, or a manifest intent to kill, or even an abstract appearance of "rationality" in the defendant's planning, but rather the depth of his appreciation of the "enormity of the evil" he proposes to commit. (61 Cal.2d at p. 822.) If, as Dr. Crahan testified, defendant was so insane that he could not understand the "nature and quality"of his contemplated act, it follows *a fortiori* that he could not "maturely and meaningfully reflect" upon its gravity. We conclude that testimony which purports to maintain two such self-contradictory propositions cannot be deemed "substantial" proof of either.

 When the foundation of an expert's testimony is determined to be inadequate as a matter of law, we are not bound by an apparent conflict in the evidence created by his bare conclusions. (*People* v. *Bruce* (1966) 64 Cal.2d 55, 63-65 [48 Cal.Rptr. 719, 409 P.2d 943].) Under our established rules and from an appraisal of the entire record in this case, we find no substantial evidence to support the verdicts of murder in the first degree. The evidence does support, however, a conviction of murder in the second degree, and it is our duty to modify the judgment accordingly.

We need not further prolong this opinion by a detailed analysis of defendant's lesser contentions. He claims various errors in instructions and admission of evidence, as well as prejudicial misconduct of the prosecutor in argument to the jury. The points have been examined, and no reversible error appears.

The judgment is modified by reducing the degree of the crimes to murder in the second degree and, as so modified, is affirmed. The cause is remanded to the trial court with directions to arraign and pronounce judgment on defendant in accordance with the foregoing ruling.

Traynor, C. J., McComb. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied September 5, 1968.