Filed 9/30/14  P. v. Honest CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B242979 |
| Plaintiff  and Respondent, | (Los Angeles County Super. Ct. No. MA051890) |
| v. | |
| CHARLES ERIC HONEST, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles A. Chung, Judge.  Reversed.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, State Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Eric E. Reynolds and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Charles Eric Honest appeals from the judgment upon his conviction and sentence of second degree murder in violation of Penal Code section 187, subdivision (a) for aiding and abetting the murder of Maurillio Ponce. In this court, appellant asserts the trial court committed various prejudicial errors that warrant reversal of his conviction and sentence. Specifically, appellant complains: (1) the trial court improperly denied his *Wheeler/Batson* motion during jury selection because the prosecution's use of preemptory challenges during voir dire was discriminatory; and (2) sufficient evidence did not support the jury's guilty verdict on the second degree murder charge. As we shall explain, appellant's claim of insufficiency of the evidence to support the jury's guilty verdict warrants reversal of the judgment.[1] Accordingly, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### Victim's Murder

Maurillio Ponce was murdered in the early morning hours of October 7, 2008. Ponce's body was found in a rural area at Avenue I and 110th Street West in Lancaster. The autopsy report concluded that Ponce's cause of death was multiple gunshot wounds. Specifically, Ponce had six gunshot wounds: two to his head, one to the chest wall, two to the back and one to the arm. The coroner could not pinpoint the exact time of death.

Maurillio Ponce was married to Evangelina Flores. At the time of the murder, Ponce and Flores resided on 70th Street in Lancaster with their three children. Ponce was self-employed as a diesel truck mechanic and owned his own business called Pikis 24-Hour Truck Repair. He also owned a tire yard in Littlerock. Flores worked at Ponce's business as a secretary and managed the finances and books of his business.

On October 6, 2008, between 10:00 p.m. and 10:30 p.m., Ponce received a call on his cell phone and he answered, "Hey, Tony." After taking the call, Ponce changed from his work clothes into a brown sweater, jeans and brown shoes, and told Flores that he was meeting Tony in Valencia or Santa Clarita and asked to borrow her Lincoln Navigator.

---

[1] Given the conclusion, we will not decide the merits of the *Wheeler/Batson* motion issue.

Flores did not find Ponce's meeting with Tony unusual because he regularly received work-related phone calls and went out in the evenings for service calls. Flores did, however, find it unusual that Ponce had asked to borrow her Lincoln Navigator because he always drove one of his work trucks, a white Ford F-450 and a blue Ford F-150. Ponce left the house at about 11:15 p.m. and asked Flores to wait up for him. This was the last time Flores saw her husband.

On October 7, 2008, at approximately 12:30 a.m., Flores called Ponce's cell phone number (661) 816-8212 but Ponce did not answer and the call went to his voice mail. Flores tried calling Ponce again between 1:00 a.m. and 1:30 a.m. but got his voice mail again. Flores tried calling Ponce a third time at about 2:00 a.m. and received a busy signal. Flores began to worry because the busy signal meant that Ponce's cell phone was off. While driving, Ponce always placed his cell phone in the car's cup holder.

On October 7, 2008, at about 2:30 a.m., Los Angeles County Sheriff's Department (LASD) Deputy Daniel Ament arrived at Flores's home to notify her that Ponce was found dead. That same morning, Deputy Michael Grijalva also went to Flores's residence to complete a stolen car report for the Lincoln Navigator, which Flores signed. The Navigator's license plate number was 5UYC561.

The Navigator was a leased vehicle and was approximately 24,000 miles over the lease mileage limit. Flores owed approximately $4,800 in mileage fees in addition to the car lease payments. She had been late with the lease payments about four to five times in the past.

### The Murder Investigation

On October 7, 2008, at approximately 2:09 a.m., California Highway Patrol (CHP) Officer Jason Wilber arrived at the crime scene at Avenue I and 110th Street West in Lancaster and saw a man lying on the ground on the right side of the road. He noticed that there was a significant amount of blood and multiple expended shell casings around the body. There were no cars or people around the victim and it was "pretty dark" because it was a rural area. Officer Wilber called dispatch and requested an LASD homicide investigation.

3

LASD Deputy Ament was assigned to canvass the crime scene area for possible witnesses and to respond to the victim's address. There were two houses located west of the crime scene at 10821 West Avenue I and 10763 West Avenue I. The residents at both addresses told Ament that they had been sleeping and heard nothing unusual. Ament then drove approximately six to six and a half miles to the victim's residence and interviewed Flores regarding the whereabouts of her husband Ponce. Flores gave Deputy Ament her husband's (661) cell phone number. Ament contacted the cell phone service provider and attempted to locate Ponce's cell phone but was unsuccessful.

LASD Sgt. Robert Gray and Sgt. Martin Rodriguez were assigned to investigate the homicide. They arrived at the crime scene at around 6:00 a.m. on October 7, 2008. The visible ballistics evidence included shell casings and an expended projectile. No fingerprints were found on the nine-millimeter casings or the projectile. There were various skid marks in the area, but none that could be tied to this incident. No weapons or tools were found in the area and no witnesses were found. Rodriguez opined that the victim was killed at the scene where he was found.

On October 7, 2008, at approximately 10:30 a.m., Sgt. Rodriguez spoke to Flores. Reviewing the victim's cell phone records, Rodriguez discovered that, prior to leaving his house, the victim last spoke to a phone number subscribed to Israel Fontana. Rodriguez was unable to locate Israel Fontana and discovered that the phone was subscribed to a fictitious address in South Gate. Rodriguez determined that the true subscriber for the (424) phone resided at Marina City Drive, where Anthony Smith resided.

On November 4, 2008, Detective Kimberly Ponce (not related to the victim or to his wife) conducted a surveillance of Anthony Smith's condominium located at 4316 Marina City Drive, Marina del Rey. In searching for a vehicle associated with Smith, Detective Ponce focused on assigned parking space numbers 623, 624, and 625, which were associated with Smith's unit.

On November 5, 2008, at 8:05 a.m., the victim's missing Lincoln Navigator received a citation for being illegally parked at 5431 6th Avenue in Los Angeles near Slauson.

4

On November 6, 2008, Detective Ponce returned to Smith's condominium to conduct more surveillance. This time, Detective Ponce saw a white Lincoln Navigator with rear license plate number 5YIP826 and front license plate number 5UYC561 parked in one of Smith's parking spots. After running a DMV check, Detective Ponce determined that the rear license plate did not belong to the Navigator, but the front license plate did. She also verified that the Navigator belonged to the victim. In addition to the Navigator in spot 625, there was a green Ford F-250 pickup truck parked in spot 624.

On the same date, Sgt. Gray and Sgt. Rodriguez asked Omar Pacheco, head of security for Smith's apartment complex in Marina del Rey, to check the surveillance video tapes for a white Navigator. Pacheco found the video footage, which showed that the Lincoln Navigator, followed by a green pickup truck, entered the Marina City Club parking area on November 5, 2008, at 1:15 p.m. The video[2] showed that a large African American, who Sgt. Gray believed resembled Smith, was driving the Navigator. The driver of the green pickup truck was not identified.

### Appellant's and Co-Defendants' Arrests and Charges

On November 6, 2008, after conducting the additional surveillance at his condominium, Detective Ponce arrested Smith. A search warrant was executed on Smith's condominium. An AR-15 was recovered underneath the bed. A box of nine-millimeter bullets was found in the hallway closet. Shirts and hats displaying police-type badges were located in the living area. A .38-caliber handgun, an empty handgun magazine and brass knuckles were also found. No nine-millimeter weapons were found. Detective Ponce also recovered a cell phone form the kitchen table and two other cell phones from Smith. The numbers for the two cell phones recovered from Smith were (424) 219-2502 and (310) 350-9557. Smith's (310) phone memory contained the cell phone numbers for the victim, co-defendant Dewann White, and appellant.

---

[2] The surveillance video was not produced at trial; Pacheco testified that detectives were not able to make a copy of the video in time because the computer system automatically erases surveillance video after 30 days.

On November 7, 2008, Smith was released from custody and voluntarily gave Sgt. Rodriguez the keys to the victim's white Navigator.

On multiple occasions in March 2009, Sgt. Rodriguez conducted surveillance of appellant at or around 6th Street and Slauson near where the Navigator had been parked and where it had received a parking citation on November 5, 2008.

On October 21, 2009, Sgt. Gray executed a search warrant for appellant's residence located at 550 North Figueroa Street in Los Angeles. Among the items recovered from appellant was a cell phone with the number (424) 219-3527. After the search, appellant was arrested. Appellant was interviewed by Sgt. Gray and Sgt. Rodriguez. Appellant was subsequently released from custody.

On March 5, 2010, a search warrant was executed at the residence of co-defendant Dewann White in Bloomington. At that time, a shotgun, a Stern Rueger .38-caliber revolver, and White's cell phone with the number (909) 419-9094 were recovered.

On March 2, 2011, Los Angeles County District Attorney Investigator David Ishibashi arrested appellant again at 1119 West Florence Avenue in Los Angeles. During the search of appellant's residence, Ishibashi recovered a Walther .40-caliber semi-automatic handgun. On March 3, 2011, appellant was interviewed again.

Appellant and co-defendants Smith and White were each charged in one-count with murder (Pen. Code, § 187, subd. (a)). Appellant was further charged with a prior strike and serious felony conviction (Pen. Code, § 667.5, subd. (b); § 667, subds. (a) & (b)-(i); § 1170.12, subds. (a)-(d)). Appellant pled not guilty.

On March 2, 2012, jury selection commenced. On March 5, 2012, appellant's *Wheeler/Batson* motion was heard and denied. Appellant was tried together with co-defendant Smith; appellant's jury was designated the "red" jury; Smith's jury was the "green" jury.

**Trial Proceedings**

The prosecution's case against appellant was premised solely on the theory he aided and abetted the murder. During the trial the prosecution presented testimony from numerous witnesses, including the investigating officers and an LASD expert in cellular

6

technology. The prosecution also played audio recordings from appellant's interviews with investigators.

### A. Appellant's Statements to Police

During his first interview with detectives, recorded on October 21, 2009, appellant stated that he had known Smith for years because they used to play sports and workout together. Smith had played football for the Raiders but was now "repo'ing cars" and had a shop.

When asked if he ever spent time in the area near 6th and Slauson, appellant said that he had his car worked on at a garage located on the northwest corner of 6th and Slauson that his mechanic friend, Sherman Lee, owned.

Appellant used to work as a bouncer at a bar called Bar Melody near the Los Angeles Airport and as a longshoreman. One day, a detective who frequented the bar offered to get appellant a Taser for unruly customers, but appellant declined stating he did not need one because he was a former bodyguard and was "trained in the arts."

Appellant stated that his phone numbers were (310) 483-1688 and (213) 215-2119, but the latter number was disconnected because he could not afford to pay the bill. He had his (310) number for years and he also said that Smith gave him a prepaid cell phone about a year and a half ago before the murder with the number (424) 219-3527. Appellant stated that he never gave his (424) phone to anyone else and for at least a year and a half, appellant had sole possession of the (424) phone.

Appellant told police he was staying with his girlfriend Terry on West Florence Avenue in Los Angeles in October 2008. Detectives also questioned appellant about an incident in 2008. Appellant said that in late October 2008 Smith had been drinking and was going to drive out of town with a shotgun and pistol in his car. Appellant told Smith not to drive with the weapons in his car and told him that he could leave the weapons at Terry's house. Appellant said he put the guns inside Terry's bedroom closet.

Appellant was shown a picture of victim's white Lincoln Navigator; he told detectives that it looked like the car owned by Smith's partner, a "Mexican dude" who was a truck driver. Appellant said that in June 2008, he drove to the Valencia/Magic

7

Mountain area with Smith and met the victim. The victim offered appellant a job to drive a truck filled with some unknown cargo. Appellant refused to take the job without knowing the contents of the cargo. Appellant said that although he needed the money, he would not risk going to jail. Appellant also said he did not know how Smith met the victim. Appellant denied working with Smith to remove stolen cargo off of trucks.

Appellant told police that sometime after June 2008, Smith told appellant that the victim wanted Smith to "chop up" the Lincoln Navigator and Smith asked appellant to follow him to 6th and Slauson to pick up the vehicle. After picking up the vehicle, appellant followed behind in Smith's truck as Smith drove the Lincoln Navigator to Smith's residence in Marina del Rey. Appellant said he did not know why the Navigator was parked at 6th and Slauson, Smith had only told him that the victim wanted them to get rid of the Navigator for him. Appellant never drove or sat in the front seat of the Navigator. He did not recall the name of the victim and denied knowing what happened to him.

The detectives told appellant that on the day he followed Smith to pick up the Lincoln Navigator and move it to Marina del Rey, a search warrant was served on Smith's residence. The detectives told appellant that the Lincoln Navigator belonged to the Mexican man depicted in the photograph and that the man had been killed. Appellant said that the person depicted in the photograph was too fat; the "Mexican dude" he saw was skinny.

During this interview, appellant also stated that he had been in the Lancaster/Palmdale area with Smith only once about four or five months earlier. Appellant restated that he had had no further contact with Smith. Although appellant said he had not been to the Palmdale/Lancaster area recently, the detectives told appellant about communications from Smith in Lancaster to appellant's (424) phone in Lancaster on the night of the murder, about half an hour before the killing. Since Smith told

8

detectives that appellant was the one who murdered the victim,[3] it explained to appellant why he had not heard from Smith.

Appellant's second interview, which was recorded on March 2, 2011, was also played for the jury. Appellant said he had not talked to Smith since the last interview. The detectives referred to Smith's previous interview about the events of October 7 and 8, 2008 and Smith's claim that the victim was last seen alive with appellant. Appellant denounced Smith's statements as lies.

When detectives asked appellant how his cell phone was in the Lancaster area, appellant admitted to going to Lancaster with Smith a second time. Appellant was not sure what date this trip occurred. Appellant stated that he went to the Lancaster area with Smith because he and White, who worked with appellant in Long Beach, were "trying to make some money" and were "supposed to drive some trucks." Smith had told appellant that he had "some things going" to "make some extra money." Appellant told detectives that White drove to Lancaster in a separate car while appellant drove to Lancaster in Smith's green truck. Appellant said it was supposed to be a "quick job" – appellant was either going to drive some trailers or offload some tires into his truck. White was supposed to drive an 18-wheeled truck. Appellant waited at an AM/PM parking lot for a phone call from Smith, who was also in the area, to arrange the job. Appellant waited for the call from Smith for an hour. When Smith finally called he said that he would meet them later and that the deal was not going to happen. Appellant called White and told him that the deal was not going to happen and they went home. Appellant said he did not see the "Mexican dude" that night.

When appellant met with Smith to move the Lincoln Navigator from 6th and Slauson, as far as appellant knew, the owner of the vehicle was still alive. Appellant believed that Smith was waiting for a call from the "Mexican dude"/owner of the vehicle

---

[3]     Smith's interview transcripts do not disclose that Smith accused appellant of being the one who murdered the victim.

9

because he wanted Smith to do an insurance job on the truck. Since Smith owed appellant money, appellant was waiting to get money from the deal.

Appellant said he did not know that anyone had been murdered until after Smith was put in jail. Appellant stated that he was overwhelmed that Smith was trying to set him up.

### B. *Cellular Telephone Evidence*

The prosecution presented cellular technology evidence, as well as testimony from a Sprint Nextel electronic surveillance technician and an LASD expert in cellular technology.

Fancisco Lamas, who had been selling Boost prepaid cellphones in the city of Lynwood since 2003, also testified at trial.[4] Lamas sold prepaid phones to customers who could choose not to give their names or addresses. Instead, Lamas used random, fictitious names and an address in Southgate. Lamas testified that a customer would be able to purchase multiple phones with the same area code and the same first three digits if acquired on the same day.

Lamas identified appellant's (424) 219-3527 cell phone and Smith's (424) 219-2502 cell phone as Motorola phones with Boost Mobile logos issued by Sprint Nextel.

Joseph Trawicki, an electronic service technician for Sprint Nextel, testified at trial. He responded to law enforcement's request for cell phone records for the victim and all three co-defendants, including appellant. Trawicki provided a detailed call record for victim's cell number (661) 816-8212. The information included: the personal phone number, the date of the call, the call initiation time, duration of the handset connection, the inbound phone dialing the call, the outbound phone that rang, the originating cell tower used at the beginning of the call, the terminating cell tower used at the end of the call, the location area code (LAC), and the cellular identifier (CID). Using spreadsheets, the LAC and CID are used to find the latitude and longitude of the tower. The latitude

---

[4] In 2008, Boost Mobile became Sprint Nextel.

and longitude are then plotted with a commercial mapping program to find the specific geographic location of the tower on a map.

Trawicki also provided a detailed call record for (310) 350-9557 with a billing address of Anthony Smith in Marina del Rey. Another detailed call record was prepared for Smith's (424) 219-2502 phone number with the account name of Israel Fontana at 8190 California Avenue in South Gate.

Another detailed call record was prepared for appellant's (424) 219-3527 phone number, with the account name of Boost, and for appellant's (310) 483-1688 number, with the account name of Chucky Brown.

Another detailed call record was prepared for Dewann White's (909) 419-9094 phone number, with the account name of Ontario Motor Sports in Rancho Cucamonga.

Detective Ty Labbe, an LASD expert in cellular telephone technology, testified at trial about the forensic analysis he conducted on the cellular data gathered in this case. From the call data records for a specific cell phone number, Labbe is able to plot on a map the location from which the cellular device communicated with a cell phone tower and determine the phone's possible movement and the direction of travel.[5]

---

[5] Phone companies set up towers in communities to be able to find its customers for billing purposes. Cell phones work on two-way radio frequencies and communicate with the closest tower bearing the strongest signal (this does not necessarily mean the closest tower geographically). The tower then confirms that the cell phone is part of their network, records the phone's location, and sends information. The cell phone is a homing device for the cellular network. This communication occurs whenever the cell phone is on, regardless of whether calls are made or received.

A high volume of data is exchanged between cell phones and towers. Towers are numbered and the sectors within the towers are numbered in the cellular network. In this case, the sectors of the Sprint Nextel tower configuration were divided into 120-degree sectors. From its records, the phone company is able to determine the tower number, what sector the cell phone registered on, and when the call was made or when a text message was received.

In conducting a forensic analysis of phone records and plotting the locations on a map, Labbe looks at the date and time of the call, whether the call was incoming,

11

Labbe focused his analysis on records for the following numbers: victim's (661) 816-8212, Smith's (424) 219-2502, White's (909) 419-9094, and appellant's (310) 483-1688 and (424) 219-3527 phone numbers.  Labbe also had the residential addresses of: Anthony Smith in Marina del Rey; Dewann White in Bloomington in San Bernadino County; and appellant in South Los Angeles.

According to phone records, on October 6, 2008, at 9:14 p.m., a call was made from White's (909) cell phone, which communicated with a cell phone tower near appellant's residence in South Los Angeles.  At 9:16 p.m. another call was made from White's cell phone, communicating with the same cell phone tower near appellant's residence.

At 9:19 p.m., Smith's (424) cell phone communicated with the cell tower just south of appellant's residence.  At 9:48 p.m., White's cell phone communicated with a tower located north of the Los Angeles Airport near Marina del Rey.  Based on these records, Labbe opined that White's phone moved from near appellant's residence at 9:15 p.m. towards Marina del Rey at 9:48 p.m.  At 9:50 p.m., White's cell phone communicated with a tower located just south of Marina del Rey.  At 10:04 p.m., Smith's (424) cell phone had an incoming call from the victim's (661) cell phone.  During that

outgoing, routed, or went to voice mail, and the duration of the call.  With a call that lasts at least five minutes, there is a good chance that potential movement can be shown.  Movement can be shown when the call ends at a different tower location.  In general, cell phones communicate with towers within a three-mile radius.  Labbe is able to determine the movement of a cell phone by considering the relative location of the towers and possible interference due to terrain such as mountains, the time of the call impacting tower activity, and the strengths of the radio frequencies.  When a phone communicates with different towers, one explanation for the different towers is that the phone is moving.  Another reasonable explanation Labbe gave is that the phone is stationary but is interrupted by a tower with a better connection based on the terrain and the type of equipment used on the towers and open areas as opposed to concentrated areas.  Labbe testified that certain movement of a cell phone, "literally within four or five feet in any direction," could cause a handoff from one tower to another.  When asked whether it is possible for a person to be on a cellphone while walking around the interior of a home, from one room to another, for the phone to hand off from one tower to another, Labbe opined that it is and that he has seen that happen before.

call, Smith's phone communicated with a tower near his residence in Marina del Rey. Based on these all records, Labbe opined that White's cell phone moved from near appellant's residence to the area near Marina del Rey. He also opined that Smith was at or near his residence in Marina del Rey.

At 10:20 p.m., Smith's cell phone received a call from the victim's (661) cell phone and communicated with a tower located in the center of Marina del Rey. At 10:56 p.m., Smith's cell phone received another call from the victim's cell phone and communicated with a tower located near the 118/134/405 freeway interchange in Granada Hills. Based on these call records, Labbe opined that Smith's cell phone moved northbound from Marina del Rey to the interchange in Granada Hills.

At 11:07 p.m., the victim's cell phone received a call from Smith's cell phone and communicated with the tower located near the north basin of Antelope Valley. At the time of this call, Smith's cell phone communicated with a tower near the Sand Canyon exit on the 14 Freeway in Santa Clarita. At 11:10 p.m., appellant's cell phone also communicated with the same tower near Sand Canyon.

At 11:43 p.m., there was another call between the victim's cell phone and Smith's cell phone, with the victim's cell phone communicating with a tower near the 14 Freeway in Acton and Smith's phone still communicating with the Sand Canyon tower in Santa Clarita. Based on the amount of time elapsed between the first and second call between the victim and Smith, Labbe opined that the victim's phone traveled from the area near his residence heading south toward Acton, between Crown Valley Road and Red Rover Mine Road on the 14 Freeway.

Labbe reviewed records of Smith's (424) and (310) cell phones from October 6, 2008, at 11:44 p.m. to October 7, 2008, at 3:18 a.m. Labbe found no record of any calls made or received by either cell phone during this time. There would be no activity on the phone if it was turned off. On October 6, 2008, at 11:34 p.m., the last outgoing call from Smith's (424) phone is to the victim's phone (the call described above). There is no further activity on Smith's (424) phone until a routed call is made at 3:19 a.m.

13

On October 7, 2008, at 12:53 a.m., the victim's cell phone communicated with a tower on Avenue I and Division Street, near the 14 Freeway in Palmdale. Based on this call record, Labbe opined that the victim's cell phone had moved northbound. At 1:04 a.m., during another call between White's cell phone and appellant's cell phone, White's cell phone communicated with the same Avenue I tower but appellant's cell phone moved south to another tower. When the call terminated at 1:05 a.m., appellant's cell phone was communicating with a tower located near 50th Street West and Avenue M in Quartz Hill. Based on these call records, Labbe opined that appellant's cell phone moved south and to the west.

At 2:02 a.m., the victim's cell phone communicated with a tower off the 14 Freeway in Acton between Red Rover Mine and Crown Valley Road. Labbe opined that the victim's phone had moved south from its previous location in Palmdale at 12:53 a.m. At about 2:05 a.m., appellant's (424) cell phone received a call from his (310) cell phone and was communicating with the same tower that the victim's cell phone had communicated with a few minutes earlier. At about 2:16 a.m., there was another call between appellant's (424) and (310) cell phones in which both phones communicated with the Sand Canyon tower off the 14 Freeway. At 2:27 a.m., White's phone communicated with a tower located in Canyon Country, which is further north on the 14 Freeway, and east of the earlier call between appellant's two cell phones.

At 2:38 a.m., appellant's (424) cell phone called his (310) cell phone. The (424) phone communicated with a tower near the 405 Freeway south of the 101 Freeway in Sherman Oaks. Appellant's (310) cell phone communicated with a tower at the interchange between the 5 Freeway and the 14 Freeway in Sylmar. Labbe opined that appellant's two phones were not traveling together because of the great distance between their respective towers. There was another call between appellant's two phones at about 2:47 a.m., with the (424) phone communicating with a tower on Ventura boulevard near Encino, while the (310) phone was communicating with a tower slightly north of that location near the Vanowen exit on the 405 Freeway. Labbe opined that appellant's two cell phones were not traveling together. At 2:49 am, there is another call between

14

appellant's phones, with the (424) phone communicating with a tower near the 405 Freeway and the Oxnard/Sepulveda exit and the (310) phone communicating with a tower further northeast near the 405/101 interchange.

On October 7, 2008, between 3:10 a.m. and 3:19 a.m., there were three calls made or received by appellant's (424) number while communicating with a tower near Washington Boulevard and Overland in Culver City. At 3:19 a.m., Smith's (424) number received a call from appellant's (424) number while communicating with the same Culver City tower.

That same day, October 7, 2008, at 3:13 p.m., Smith's (424) number called appellant's (424) number. At that time, Smith's cell phone communicated with a tower in Marina del Rey while appellant's cell phone communicated with a tower in south Los Angeles. At 3:35 p.m., there is another call from Smith's (424) phone to appellant's (424) phone. At that time, Smith's phone communicated with the same Los Angeles tower as appellant's phone.

On October 8, 2008, at 12:34 a.m., Smith's (424) phone was communicating with a tower in Culver City and made a call to appellant's (424) phone, which communicated with a tower in Inglewood. At 2:27 a.m., there is another call between appellant's (424) phone and Smith's (424) phone. Smith's phone hits a tower near Balboa Park, while appellant's phone communicated with a different tower in the same Balboa Park area. At 2:28 a.m., there is a call where both phones hit off the same tower in Sherman Oaks. At 2:48 a.m., both phones were in the same area in Los Angeles communicating with the same towers.

### C.    Other Evidence

In order to prove that the shooting occurred at 1:30 a.m. on October 7, 2008, the prosecution offered testimony from two private security guards, Brandon McClure and Daniel Mergili, who were working at the Edison power plant at 9634 West Avenue J. At 1:30 a.m., McClure and Mergili were entering their GPS location at a check point during their hourly patrol route when they heard gunshots coming from the northwest direction of the compound. Mergili testified that after the first shot, there was approximately 15

15

seconds of pause, then another gunshot followed by a second 15-second pause, and then finishing with four to five gunshots in a row. Neither McClure nor Mergili saw any muzzle flash or cars speeding away from the direction of the gunshots.

Dr. Yulai Wang, a deputy medical examiner with the Los Angeles County Coroner's Department, conducted the victim's autopsy and determined the cause of death to be multiple gunshot wounds. The victim had six gunshot wounds: two in the head, one in the chest wall, two in the back, and one in the arm. Wang was able to recover one bullet from the right side of the trunk, another bullet from the victim's clothes, and one bullet fragment from the victim's neck. Wang testified that the bullets were "medium size," consistent with a nine-millimeter caliber.

LASD Deputy Edmund Anderson, a firearms identification expert, also testified during the trial. Anderson analyzed the bullet casings and projectiles recovered at the scene. He opined that the five nine-millimeter bullet casings were all expended out of the same handgun. He found the comparison results as to the projectiles to be inconclusive and could not determine whether they have been fired from the same handgun. Anderson was, however, able to determine that the three fired bullets from the Coroner's office were nine-millimeter bullets, which could have been fired from a Smith & Wesson Sigma-type pistol. The fourth bullet had similar rifling characteristics.

Redolfo Escobar, who worked as a mechanic for the victim in 2008, also testified in court. Escobar testified that the victim worked all hours of the night and day and had a lot of clients. Several months before the victim's murder in October 2008, Escobar saw a green pickup truck with collision damage on both sides at the victim's tire yard in Littlerock. Escobar testified that the green pickup truck found at Smith's residence looked the same as the green pickup truck he saw at the tire yard. He described the driver of the green pickup truck as a tall and heavy African-American man. Escobar did not see anyone in the courtroom who looked like the man he saw get out of the green truck.

Sometime later, Escobar saw the green truck again at a Taco Bell located by Palmdale Boulevard and the 14 Freeway. Escobar saw two tall, heavy African-American men exiting the green truck. Escobar stayed in the truck while the victim got out and

16

entered the back of the green pickup truck.  They all left in the green truck and returned two to four hours later.  Escobar waited inside the victim's white pickup truck at the Taco Bell.

Krystal Crail, the mother of appellant's four-year-old daughter also testified.  Although their romantic relationship ended in October 2007, Crail still spoke to appellant in 2008.  She stated that appellant's nicknames were "Chucky" and "Cheese."  On October 7, 2008, Crail resided on Mentone Avenue in Los Angeles.  She did not recall whether appellant stayed overnight during that time, but she doubted it.  Crail testified that she would not be surprised if the records showed she called appellant's (424) phone on October 7, 2008, at 3:10 a.m. and again at 3:15 a.m.

Neither appellant nor Smith testified at trial.  A jury acquitted appellant of first-degree murder and convicted him of the lesser second degree murder charge.

**Post Verdict and Sentencing**

Appellant's motions for new trial and to dismiss the prior conviction were heard and denied.  The court imposed a sentence of 35 years to life in prison.

Appellant filed this appeal.

*DISCUSSION*

I. ***Substantial Evidence Does Not Support Appellant's Second Degree Murder Conviction***

Appellant contends sufficient evidence did not support his second degree murder conviction under the prosecution's theory that appellant aided and abetted the charged murder.

A. ***Relevant Legal Principles***

1. ***Sufficiency of the Evidence***

A criminal conviction not supported by sufficient evidence violates both state and federal due process and is thus invalid.  (U.S. Const., amend. XIV, § 1; Cal. Const, art. I, § 15; *People v. Rowland* (1992) 4 Cal.4th 238, 269.)  "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value

17

such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We must presume the existence of every fact that the trier of fact could reasonably deduce from the evidence. (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1322.) Nonetheless, evidence that merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence, it merely raises a possibility, and this is not a sufficient basis for an inference of fact. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Moreover, we must determine whether the evidence of each of the essential elements of the crime is substantial; it is not enough for the respondent to simply point to "some" evidence supporting the finding. (*People v. Bassett* (1968) 69 Cal.2d 122, 138.)

The sufficient evidence standard is the same whether the evidence is direct or circumstantial. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 200; *People v. Pierce* (1979) 24 Cal.3d 199, 210 ["Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt"].) Whether a particular inference can be drawn from the evidence is a question of law. (*People v. Austin* (1994) 23 Cal.App.4th 1596, 1604, *disapproved on other grounds, People v. Palmer* (2001) 24 Cal.4th 856, 864.) "A reasonable inference, however, may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. A finding of fact must be an inference drawn from the evidence rather than . . . a mere speculation as to the probabilities without evidence." (*People v. Morris* (1988) 46 Cal.3d 1, 21.) Although all reasonable inferences must be drawn in support of the judgment, we "may not go beyond inference and into the realm of speculation in order to find support for a judgment. A finding . . . which is merely the product of conjecture and surmise may not be affirmed." (*People v. Memro* (1985) 38 Cal.3d 658, 695 *disapproved on other grounds, People v. Gaines* (2009) 46 Cal.4th 172, 181.) When the facts give equal support to two competing inferences, neither is established. (*People v. Acevedo* (2003) 105 Cal.App.4th 195, 198.)

Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible to two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. (*People v. Milwee* (1998) 18 Cal.4th 96, 132.) "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." (*People v. Bean* (1988) 46 Cal.3d 933.)

We may reverse for lack of substantial evidence only if "upon no hypothesis whatever is there sufficient substantial evidence to support" the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1508.) Finally, if the verdict is supported by substantial evidence, we accord due deference to the verdict and will not substitute our evaluations of the witnesses' credibility for that of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078; *In re Frank S*. (2006) 141 Cal.App.4th 1192, 1196.)

Finally, the sufficiency of the evidence must be assessed in light of the prosecution's theory of conviction in the trial court. (*Cole v. Arkansas* (1948) 333 U.S. 196.) In order to conform to due process of law, "[defendants are] entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were presented in the trial court." (*Id.* at pp. 201-202; see also *People v. Smith* (2005) 37 Cal.4th 733, 740.)

### 2. Second Degree Murder Under the Theory of Aiding and Abetting

To prove a defendant is an aider and abettor, the prosecution must demonstrate that the person acted with knowledge of the criminal purpose of the perpetrator; with an intent or purpose either of committing or encouraging or facilitating the commission of the crime; and by act or advice, aided, promoted, encouraged, or instigated the commission of the crime. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; see also CALCRIM No. 3.01.) When the offense charged is a specific intent crime, like second

degree murder, the accomplice must share the specific intent of the perpetrator; this occurs when the aider and abettor knows "the full extent of the perpetrator's criminal purpose and give[s] aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) Where the jury is not instructed on the natural and probable consequences doctrine, as in the present case, an aider and abettor of the intended murder "must know and share the murderous intent of the actual perpetrator." (*People v. McCoy, supra,* 25 Cal.4th at p. 1118.)

In addition, although a person who aids and abets in the commission of a crime need not be personally present at the scene of the crime, presence at the scene of the crime, which does not itself assist the commission of the crime, does not amount to aiding and abetting. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 91.) Moreover, knowledge that a crime is being committed and the failure to prevent it, does not amount to aiding and abetting. (*In re Michael T*. (1978) 84 Cal.App.3d 907, 911.)

### B.    Analysis

At trial, citing Smith's possession of the victim's car keys, car, and cell phone, the prosecution argued that Smith was the actual killer. Accordingly, the prosecution pursued the murder charge against appellant based solely on an aiding and abetting theory. The prosecution relied on the "shared intent" theory for second degree murder, rather than the natural and probable consequences doctrine. Before this court, appellant claims that the evidence presented at trial did not support the prosecution's theory. As we shall explain, reviewing the evidence and the entire record in the light most favorable to the prosecution, there is insufficient evidence to convict appellant of aiding and abetting the murder of the victim based on the intent theory urged by the prosecution at trial.

Other than appellant's statements saying he was waiting at an AM/PM for Smith's call, there is no other evidence to show what exactly appellant was doing or his exact whereabouts between 1:05 a.m. and 1:30 a.m. on October 7, 2008. Nonetheless, based on the cell phone evidence, a jury could have reasonably inferred that appellant was present

at the scene of the murder. Even assuming appellant was actually present at Avenue I and 110th Street West at the time the victim was killed, however, there is insufficient evidence to prove that appellant had knowledge of Smith's criminal purpose, much less shared Smith's murderous intent.

In addition to the cell phone records, the prosecution also relied on evidence regarding appellant's background to assert that he aided and abetted in the murder. The victim had multiple bruises all over his body indicating that he had been beaten prior to being killed. The prosecution argued that appellant, who was "trained in the arts" must have assisted in the victim's murder by beating and kicking the victim before Smith shot him multiple times. Even assuming that the jury reasonably inferred that appellant assisted in the aggravated assault, the fact that he assisted in the assault does not demonstrate appellant had the requisite, specific shared intent to support his second-degree murder conviction.

The prosecution also drew attention to appellant's involvement after the murder. The prosecution argued the evidence showed that appellant drove Smith from the place where the victim was murdered and thereafter facilitated the shooter's escape, therefore proving that appellant aided and abetted the murder. The cell phone evidence and appellant's conduct after the murder including his admissions that he followed Smith to 6th Street and Slauson to pick up the Lincoln Navigator and that he followed Smith back to his residence in his truck show that appellant was an accessory after the fact to the crime. This evidence, however, in our view is insufficient to show that appellant acted with personal knowledge of Smith's murderous purpose, shared that purpose or that he formed the specific intent to commit or encourage the murder of the victim.

In view of the foregoing we conclude, there was insufficient evidence to support the appellant's conviction of second-degree murder based on the prosecution's "shared intent" theory of aiding and abetting urged at trial.

21

## *DISPOSITION*

The judgment is reversed.


                                                 **WOODS, J.**


**We concur:**


**PERLUSS, P. J.**


**SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.